**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas N. TERREY,
Defendant-Appellant.**

No. 76–2676.

United States Court of Appeals,
Fifth Circuit.

June 22, 1977.

---

Edward R. Finck, Jr., Albert M. McNeel, Jr., San Antonio, Tex., for defendant-appellant.

John E. Clark, U. S. Atty., Henry Valdespino, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, GEE and FAY, Circuit Judges.

WISDOM, Circuit Judge:

This appeal challenges a recovery by the United States on a guaranty agreement executed by the defendant-appellant, Terrey, to secure a Small Business Administration loan. When the original debtor, SESO Corporation, defaulted on the loan, it turned over its assets to the SBA. The Administration sold the assets at a public auction and sued Terrey for the resulting deficiency. The district court directed a verdict for the SBA, overruling Terrey's contention that the agency had not sold the assets in a commercially reasonable manner. We hold that the jury should have been allowed to decide whether the sale was commercially reasonable. We reverse the judgment of the district court and remand for a new trial.

I.

Thomas Terrey and Stephen Taylor organized SESO in 1970 and became its only officers and shareholders. They manufactured burglar alarms until 1972 when the federal government reserved for its own use the radio frequency used in the alarms. Instead of changing frequencies, the men decided to change products and to develop a computer-controlled message board sign for sale to retail businesses. Shortly thereafter, they sold the controlling interest in the corporation to Milton E. Travis and L. E. Travis, Jr., who invested $50,000 in the business and leased a computer programmer to the company.

SESO secured a $100,000 loan from the National Bank of Commerce of San Antonio on March 23, 1973, as a source of working capital. The company executed a note in the amount of the debt and entered three security agreements with the bank covering the company's equipment, furniture, fixtures, inventory, accounts, and contract rights, as well as 525 shares of SESO stock issued to Terrey and Taylor. At the same time Terrey entered a guaranty agreement with the bank pledging payment under the terms of the note.

Both the note and the guaranty were standard forms provided by the SBA. The note provided that its holder could "sell, assign, and deliver the whole or any part of the Collateral at public or private sale, without demand, advertisement or notice of the time or place of sale or of any adjournment thereof, which are hereby expressly waived". The note also stated:

This promissory note is given to secure a loan which SBA is making or in which it

is participating and, pursuant to Part 101 of the Rules and Regulations of SBA (13 C.F.R. 101.1(d)), this instrument is to be construed and (when SBA is the Holder or a party in interest) enforced in accordance with applicable Federal law.

The guaranty provided that Terrey unconditionally guaranteed payment of the note and that he granted to the bank:

Full power, in its uncontrolled discretion and without notice to the undersigned, *but subject to the provisions of any agreement between the Debtor or any other party and Lender at the time in force,* to deal in any manner with the Liabilities and the collateral, including but without limiting the generality of the foregoing, the following powers:

. . . . .

(3) In the event of the nonpayment . . . or in the event of default . . . to realize on the collateral or any part thereof, as a whole or in such parcels or subdivided interests as Lender may elect, at any public or private sale or sales, for cash or on credit or for future delivery, without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the Undersigned hereby waiving and such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise, or to forebear from realizing thereon, all as Lender in its uncontrolled discretion may deem proper, and to purchase all or any part of the collateral for its own account at any such sale or foreclosure, *such powers to be exercised only to the extent permitted by law.* [Emphasis added.]

The guaranty did not state whether state or federal law governed the terms of the agreement.

The security agreements, on the other hand, entered contemporaneously with the note and the guaranty, provided, "The law governing this secured transaction shall be the Texas Uniform Commercial Code and other applicable laws of the State of Texas." Furthermore, point VII–B of each security agreement limited the remedies of the secured party in conformance with the Texas UCC.[1]

SESO made only three payments on the note. In November 1973, when it had

1. The agreements with company property as collateral stated the following in part:

(1) Upon the occurence [*sic*] of an Event of Default, or if Secured Party deems payment of Debtor's obligations to Secured Party to be insecure, and at any time thereafter, Secured Party may declare all obligations secured hereby immediately due and payable and shall have the rights and remedies of a Secured Party under the Uniform Commercial Code of Texas, including without limitation thereto, the right to sell, lease or otherwise dispose of any or all of the Collateral and the right to take possession of the Collateral, and for that purpose Secured Party may enter upon any premises on which the Collateral or any part thereof may be situated and remove the same therefrom. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will send Debtor reasonable *notice of the time and place of any public sale thereof or of the time after which any private sale or other disposition thereof is to* be made. The requirement of sending reasonable notice shall be met if such notice is mailed, postage prepaid, to Debtor at the address designated at the beginning of this Security Agreement at least five days before the time of the sale or disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall include Secured Party's reasonable attorneys' fees and legal expenses, and Debtor agrees to pay such expenses, plus interest thereon at the rate of ten per cent (10%) per annum. Debtor shall remain liable for any deficiency.

The agreement with the stock as collateral stated the following in part:

B. Remedies in Event of Default.

Upon the occurrence of an Event of Default, or if Secured Party deems payment of Debtor's obligations to Secured Party to be insecure, and at any time thereafter: (1) Secured Party may declare all obligations secured hereby immediately due and payable; (2) Secured Party shall have, then or at any time thereafter, the rights and remedies provided in the Uniform Commercial Code in *force in the State of Texas at the date of execution of this Security Agreement;* and (3) In addition to the rights and remedies

missed four payments, it ceased business for lack of operating capital. In a meeting on November 19 between Terrey, his lawyer, a bank officer, and three officials of the SBA, Terrey turned over the assets of the corporation to the SBA. Although at trial the participants did not recall the meeting clearly, they apparently did not reach any agreement about liquidating the business. There is no written record of the meeting. On November 27 the bank assigned the note, security agreements, and guaranty to the SBA in return for payment by the agency of 90 percent of the amount due on the note.

The SBA put one of its loan officers, John Swidelsky, in charge of the collateral and the liquidation of SESO. After the meeting on November 19, he immediately changed the locks on the building leased by the company at 307 Nakoma Street in San Antonio, secured equipment and supplies that were stored outdoors, and posted no trespassing notices. He took pictures of the property and also checked company supplies stored at two other locations. He did not inventory or appraise the assets. He also failed to ascertain the history of the business because, he said, the company was going into liquidation. In a deposition before trial he said he had not requested the history perhaps because he was not interested in it. At trial he also said he could not remember when or whom he had asked for the books of the company.

Within a day or two of the November 19 meeting, Swidelsky, after consultation with other SBA officials, decided that a public auction would best liquidate the company assets.[2] Although Swidelsky admitted at trial that the agency usually attempted to negotiate sales of entire businesses, he did not attempt such a sale of SESO.[3] He testified that public auctions were last resorts for disposition, but he did not explain why the decision to auction the assets of SESO was reached within two days of the abandonment of the collateral, before the agency knew the value of the business.

Instead of negotiating a private sale, Swidelsky contacted Ernest St. Clair, an experienced auctioneer, to request that his company handle a public auction of SESO. St. Clair had never liquidated an electric sign manufacturing business before, but he accepted the SBA offer and inspected the SESO property within a week of the request. After visiting the premises only once, he told the SBA that he estimated the value of the assets at $15,000. Despite the fact that the outstanding balance on the loan exceeded $94,000, the SBA accepted the St. Clair estimate. When the value was set, neither the auctioneer nor the agency knew that two of the signs in the company's inventory were nearly completed. The defendant set their value at $56,000 and the value of the entire assets at $121,300. These figures were never conveyed to the SBA, in part because the agency never informed Terrey of St. Clair's estimate.

referred to above, Secured Party may in its discretion, sell, assign and deliver all or any part of the Collateral at any Broker's Board or at public or private sale without notice or advertisement, and bid and become purchaser at any public sale or at any Broker's Board. If notice to Debtor is required by the Uniform Commercial Code of Texas of public or private sale of Collateral, Secured Party may give written notice to Debtor five days prior to the date of public sale of the Collateral or prior to the date after which private sale of the Collateral will be made, by mailing such notice to Debtor at the address designated at the beginning of this Security Agreement. Secured Party may apply the proceeds of any disposition of Collateral available for satisfaction of Debtor's indebtedness and the expense of sale in any order of pref-

erence which Secured Party, in its sole discretion, chooses. Debtor shall remain liable for any deficiency.

2. Documentation of the choice of St. Clair was not written until December 20 when Swidelsky wrote an inter-office memorandum recommending the public auction to his superiors. A written agreement with St. Clair was signed December 26. The testimony shows, however, that these documents merely confirmed decisions made immediately after the November 19 meeting.

3. The only sale solicitation mentioned by Swidelsky was his attempt to interest Milton Travis, the owner of the building rented by SESO and a stockholder in the company, in buying the business.

Shortly after St. Clair inspected the assets, the SBA set the date for the auction for January 15, 1974. Although Swidelsky testified that he could not remember why the agency had decided so quickly to auction the assets, he said that the date was established to avoid the Christmas holidays, to ensure adequate preparation by St. Clair, and to guarantee vacation of the building by January 19, 1974, when another month's rent of $500 became due. Terrey was not informed of the date until January 2.

In early December Terrey contacted Cummings and Company, now the parent corporation of American Time, a manufacturer of computerized signs, regarding the purchase of SESO. In response, two officers of American Time met with Swidelsky and Taylor on December 10 to inspect the property. According to a file memorandum written by Swidelsky:

They inspected the premises and appeared to be very interested. However, Mr. Short [the president of American Time] stated that before they could seriously consider purchasing the business, they would require an accurate list of inventory, a list of all contracts and status thereof, and a list of jobs and what it would require in terms of time and money to complete such jobs . . . ..

Swidelsky sent Taylor an inventory list compiled earlier by an independent accountant. Terrey testified, however, that Taylor, who had not managed the company since September, did not assemble the other requested information. Consequently, Terrey took the information to American Time during the first week of January, when he learned of its continuing interest in purchasing SESO. According to the defendant, they discussed a sale price of $100,000 to $110,000 but reached no agreement. Terrey conveyed this continuing interest to Swidelsky on January 9 and requested a three-week delay to enable American Time to evaluate the information Terrey had supplied. An SBA file memorandum written by Swidelsky indicates that he refused to postpone the auction. Furthermore, he told

Terrey that American Time would have to come up with a firm offer and $50,000 before the SBA would consider selling the company as a whole. There was no indication in the record that the assets would have deteriorated during a three-week delay. A postponement would have cost the agency only an extra month's rent. A defense expert testified that refusing to permit the delay merely to avoid the additional $500 expense was commercially unreasonable, especially when American Time was considering a purchase price of seven times the SBA's estimated value of the collateral.

St. Clair prepared for the auction and conducted it in his usual manner. He advertised the sale in Texas papers and the Wall Street Journal. He mailed brochures about the assets to those who responded to the ads as well as to related businesses in Texas and to those persons and companies in San Antonio that appeared on his 300,-000-person mailing list. The publicity attracted 106 bidders including Terrey and Taylor.

Nevertheless, Terrey called Swidelsky on the morning of the auction to complain about the preparations. St. Clair had told the defendant that the auctioneer did not know the value of many of the assets to be auctioned. Specifically, Terrey discovered that St. Clair did not know the difference in value between a ninety-cent optical coupler and a one-cent capacitor. The collateral included large quantities of both items. In addition, St. Clair had not advertised the sale with the two largest manufacturers of electronic, computerized signs. He had also displayed an allegedly complete sign for Kennedy & Kohen as two unrelated sections. St. Clair changed his displays to conform to Terrey's suggestions and the auction occurred as planned. Four auctioneers conducted the sale, spelling each other periodically. The $27,200 received for the piecemeal sale of 363 lots of equipment exceeded the sole bulk bid of $22,000. Consequently, the bulk bid was rejected and the piecemeal bids accepted. After expenses, the sale netted $23,865.67, which the SBA applied to the debt of $101,170.17.

After hearing these facts, the district court decided to direct a verdict in favor of the Government. It did not issue a written opinion, having reached its factual conclusions before the defendant completed his case in chief. After refusing to qualify one defense witness as an expert, the court engaged an expert who did qualify in the dialogue below.[4] The fact that Terrey had voluntarily turned over the property to the agency emerged as the preeminent factual consideration to the court. In the explanation of its decision from the bench, it also concluded that Terrey should have told the agency about the outstanding contracts for signs and that the SBA owed no duty to expend its own resources searching for buyers of the assets.[5]

## II.

 The district court assumed that the SBA should have disposed of the collateral

4. THE COURT: All right. Now, you [defense counsel] are asking him questions based on matters that are not in this record. Now, just not assume, but I'm telling you that on the 19th day of November the party in question here walked into the SBA office and said, I want you—I give this over to you, protect this property. I owe you a lot of money. And that very day SBA went out and locked it up. A lot of the material, metals and wire and so forth, were out in a parking lot not covered. In fact, most of them were out in the parking lot not covered, and needed protection. And the so-called person involved never told SBA that he had contracts for the sale of these partially— signs. Never turned over the books. Just abandoned the assets.

Now, suppose you were a liquidator, and that's all you knew. Would you start out and hire a lot of help, or would you put it up for auction and solicit people in the electronic business of the whole area and get one hundred six registered bidders there for an auction? Does that sound an unreasonable action to you?

THE WITNESS: Not under the circumstances the way you have outlined them, Your Honor.

THE COURT: Precisely that's this case. What is commercially unreasonable about the action of the Small Business Administration under the facts that I've given you?

THE WITNESS: That sounds like to me that you had an abandonment of property and equipment and everything else that was just left loose. You would have to do what you could to protect it.

THE COURT: You would have to do what you could to protect it and get rid of it, right?

THE WITNESS: That's true.

THE COURT: Suppose you didn't have the books, and the only reason given to you now after the fact is SBA didn't ask for them. SBA was right there available at all times, never told them until perhaps told the auctioneer the day before the auction that they were component parts of one sign, never gave him a contract, that he had had them sold or that he was building them according to specifications. What would you do?

THE WITNESS: You have nothing to go on.

THE COURT: Of course you have nothing to go on. Now, would you call that commercially unreasonable?

THE WITNESS: If that was all the facts that I had, I would certainly not call it commercially unreasonable.

THE COURT: I'm giving you the real facts of this case.

MR. FINCK: Your Honor, we respectfully don't think those are the facts in the case.

THE COURT: Well, I'm finding them as the facts in the case, and I'm going to base my decision on it.

5. [The secured party] must now allow it to deteriorate nor need he hold it, run up expense, run up—search the country for buyers. He has the right and the Small Business Administration has the right to make its own determination of how it will . . . dispose of the assets. .

[T]he evidence in this case does not warrant any charge against the Small Business Administration that it failed to act properly in all that it did, because I am saying to you that the evidence . . . was that the assets of the SESO Corporation were actually surrendered to the Small Business Administration.

The Defendant in this case . . . apparently didn't see fit to tell Mr. SBA that he had contracts. I believe he told us that he didn't think or—or, once he, himself said he wasn't interested. But there was a duty on the part of the debtor to transmit contracts as well as fungible goods, goods in sight. Contracts are valuable, but they should be brought to the attention of the proper parties. They weren't in this case. And under the particular circumstances of this case, I am holding as a matter of law that the sale of the collateral was reasonable and that the Defendant has gotten credit for all that he is entitled to under the law.

The government is not under the duty of searching out and getting the greatest amount of money by spending a lot of its own money in searching for buyers. . . .

in a "reasonable" manner. On appeal Terrey supports this legal proposition by arguing that the SBA had the duty under the Texas UCC to effect a commercially reasonable disposition. The Government submits that no such duty existed because the Texas UCC did not govern the transaction.[6]

■ The choice of law analysis required by *Clearfield Trust Co. v. United States,* 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, indicates that the district court correctly applied the UCC standard to the SBA disposition of the SESO assets. First, federal law controls the rights and duties of the United States when it operates a program such as the SBA loan guaranty program. *Mitchell v. Shephard Mall State Bank,* 10 Cir. 1972, 458 F.2d 700, 703; *see United States v. Hext,* 5 Cir. 1971, 444 F.2d 804, 808; *United States v. Wells,* 5 Cir. 1968, 403 F.2d 596, 597. In *Clearfield* the Government issued a check to a worker on a W.P.A. project. The check was stolen and an endorsement forged. Although agents of the United States learned of the forgery two weeks after the check was issued, the Government did not notify the bank that had accepted the check and guaranteed the endorsement until more than eight months later. The district court ruled that the delay was unreasonable under Pennsylvania law and therefore that the United States could not recover its payment to the bank for the check. The Supreme Court held that federal law governed the transaction because:

> The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state. . . . The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same Federal sources.

318 U.S. at 366, 63 S.Ct. at 575, 87 L.Ed. at 841. Similarly, the SBA assumed the SESO note, security agreement, and guaranty pursuant to federal constitutional and statutory authority.[7] The duties imposed on the Government by the assumption should therefore derive from the same federal law.

■ Second, when federal law applies to a case, *Clearfield* instructs the federal courts to "fashion the governing rule of law according to their own standards" if Congress has not selected a rule. *Id.* at 367, 63 S.Ct. at 575, 87 L.Ed. at 841. This discretion extends to the selection of the rule of the forum state. But when the effectiveness of the federal program depends on the application of a uniform rule, varying state standards should not be employed. *Id.* at 367, 63 S.Ct. at 575, 87 L.Ed. at 842. In this case, of course, Congress has not imposed on the SBA any particular standard of care regarding dispositions of collateral. The Court must therefore develop the standard. Regarding the need for uniformity, it appears that the need for consistent standards governing SBA transactions is at least as great as the need in *Clearfield* for a uniform check clearing process. But the apparent similarity does not dictate that a nation-wide rule be applied here because the agency has contracted for the application of the law of the forum state.

■ Although the guaranty agreement is stated as unconditional, two important limitations in the document show that the parties intended it to be limited by the Texas UCC. First, the guarantor granted the lender "full power, in its uncontrolled discretion . . . to deal in any manner with the Liabilities and the collateral". But this power was expressly limited by "the provisions of any agreement between the Debtor or any other party and Lender at the time in force". In this case the security agreements, which applied Texas law to the transaction and limited the se-

---

6. The United States may advance this argument without filing a cross appeal because the contention actually supports the judgment of the district court. *See Jaffke v. Dunham,* 1956, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314, 315; *United States v. American Ry. Exp. Co.,* 1924, 265 U.S. 425, 435–36, 44 S.Ct. 560, 68 L.Ed. 1087, 1093–94.

7. *See* U. S. Const. art. I, § 8, cl. 3; 15 U.S.C. § 631 (1970).

cured party's remedies to those announced in the UCC, were in force when the Government enforced the guaranty agreement. Consequently, the power of the SBA to dispose of the collateral was limited by security agreements applying Texas law to the transaction. Second, the rights of the United States upon nonpayment of the debt are expressly limited by the phrase, "such powers to be exercised only to the extent permitted by law". The Government's interpretation of the guaranty as absolute would read this clause out of the contract. We think that the parties intended no such result when they entered into the agreement. The more reasonable inference is that they intended to limit the creditor's discretion in disposing of the collateral and to apply the same law that governed the security agreements, which they entered contemporaneously with the guaranty, to the obligation that Terrey owed the bank and later the SBA. In conformance with the several contracts, then, we apply the Texas UCC as the federal law of decision. Under section 9.504 of the Texas Business and Commerce Code the SBA should have disposed of the SESO collateral in a commercially reasonable manner.[8]

### III.

 Texas has never decided when a public auction of collateral should be considered a commercially reasonable disposition as a matter of law. We must therefore divine the answer that Texas would reach if it faced this question. First, whether a disposition is commercially reasonable generally poses a question of fact. *Pruske v. National Bank of Commerce*, Tex.Civ.App. 1976, 533 S.W.2d 931, 937; *Christian v. First National Bank*, Tex.Civ.App.1975, 531 S.W.2d 832, 838. Second, if the creditor decides to liquidate the collateral, he must

act as the debtor's fiduciary in disposing of the assets. His duty is to make a sincere effort to obtain the full market value for the property. 531 S.W.2d at 839. As the factfinder applies this standard to the facts, he must consider all aspects of the sale, not just any disparity between the market price of the collateral and the value realized from the disposition. 533 S.W.2d at 937.

This sketchy guidance from the Texas cases is consistent with the interpretation given section 9–504 of the Uniform Commercial Code in other jurisdictions. Any disparity between price and market value is usually not dispositive but may be considered as one factor in the determination of commercial reasonableness. *Mercantile Financial Corp. v. Miller*, E.D.Pa.1968, 292 F.Supp. 797, 801; *Associates Finance Co. v. Teske*, 190 Neb. 747, 212 N.W.2d 572, 1973. Also not conclusive of a commercially reasonable liquidation is the fact that the creditor held a public sale. *Mallicoat v. Volunteer Finance & Loan Corp.*, 57 Tenn.App. 106, 415 S.W.2d 347, 1966. As an early commentary on Article 9 suggested:

> Although there is an argument to the contrary, it seems possible that even the question of public or private disposition must be examined in terms of commercial reasonableness. . . . [T]he Code explicitly requires that the method or manner of the disposition must be commercially reasonable, and the question of public or private sale is plainly a question of method and manner.

Hogan, *The Secured Party and Default Proceedings under the UCC*, 47 Minn. 205, 225–26 (1962). The same commentary also addressed the question of bulk versus parcel sales and concluded, "Where disposition of the collateral as a unit would obviously bring a better price, commercial reasonable-

---

**8.** We do not now decide what the federal rule of decision would be in absence of the contractual provisions. We do note in this case, however, that the application of the Texas rule based on the Uniform Commerical Code poses little threat to the federal program. First, this is not a mandatory program. The Government must entice local banks such as the NBC to lend money to the small businesses. The local

institutions are more likely to cooperate if the agreements they enter are governed by local laws with which they deal regularly. Second, the Government will not face disparate rights and responsibilities by the application of the rule of the forum state because the law governing commercial transactions in 49 states is the Uniform Commercial Code.

ness probably dictates a sale as a unit." *Id.* at 228.

Another section of the UCC provides further guidance as to the meaning of "commercial reasonableness".[9] Section 2–706, which Texas has adopted, permits sellers to resell goods after a breach of contract. But the resale must meet the same standard as an Article 9 liquidation: "[E]very aspect of the sale including the method, manner, time, place and terms must be commercially reasonable." Texas Bus. & Comm. Code Ann. § 2.706(b) (1968). Comment 4 to section 2.706 identifies the purpose of the commercial reasonableness standard:

> to realize as high a price as possible in the circumstances. By "public" sale is meant a sale by auction. . . . In choosing between a public and private sale the character of the goods must be considered and relevant trade practices and usages must be observed.

■ Against this legal background we must evaluate the district court's decision to direct a verdict for the Government. Under *Boeing Co. v. Shipman,* 5 Cir. 1969, 411 F.2d 365 (en banc), our inquiry is limited to the question whether the district court properly substituted its judgment for that of the jury. "If there is substantial evidence opposed to the motions [for a directed verdict], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied." *Id.* at 374.

The district court based its directed verdict on three propositions. First, it concluded that the disposition by the SBA was reasonable because Terrey had surrendered the assets of the corporation to the agency. The court did not explain how the surrender related to the disposition. Second, the

disposition was held "reasonable as a matter of law" because Terrey had not called the SBA's attention to contracts for the sale of several signs. The court declared as a matter of fact that Terrey had testified that he was not interested in the contracts. Third, the court declared that the Government had no duty to expend its own resources in a lengthy search for a private buyer and that the agency could sell the collateral in whatever manner it deemed appropriate. In particular, the court said the Government violated no duty by not searching for a private buyer when the search would have caused additional rent payments and expenses to prevent vandalism.

■ The district court's reasoning does not demonstrate that reasonable men could not disagree about whether the SBA's actions were commercially reasonable. First, the fact that Terrey surrendered the assets to the SBA is irrelevant to the issue of the reasonableness of the disposition. The SBA agreed to take the collateral; had Terrey not offered it, the agency would have received authority over it anyway by assuming the bank's rights and obligations. The duties under the guaranty and security agreements do not vary with the procedure through which the agency assumed authority over the collateral. Instead, the duties vary only with the approach the agency used to collect under the guaranty, regardless of how it obtained the right to collect. The agency, as well as the bank, could have disregarded the collateral altogether and sued Terrey directly for the full amount of the debt. According to the fifth paragraph of the guaranty, the Government's duty then would have been to refrain from any "wilful act or failure to act" that would have caused "any deterioration, waste, or loss by fire, theft or otherwise of any of the

---

**9.** One of the more thorough analyses of the commercial reasonableness standard appears in *Old Colony Trust Co. v. Penrose Industries Corp.,* E.D.Pa.1968, 280 F.Supp. 698, which analogized to section 2–706. The detailed discussion renders an excellent picture of a commercially reasonable disposition of collateral. The secured party thoroughly investigated the type of sale that would have been most advan-

tageous to the debtor, as well as to the secured party. The seller also secured expert advice about the manner of disposition from a broker of such collateral. It was decided that public scrutiny of the bankrupt business would decrease the value of the collateral. Consequently, the sale occurred through private bids, which were bargained in a "fair, businesslike manner". *Id.* at 717.

collateral". When the SBA decided to move against the collateral, however, the guaranty agreement in paragraph two imposed on it the duty to dispose of the assets in a commercially reasonable manner. That Terrey surrendered the assets voluntarily, rather than forcing the bank or the SBA to foreclose, does not affect the agency's responsibility.

Second, the district court's concern about the contracts does not justify removing the case from the jury. Terrey's failure to call the agency's attention to the agreements immediately may be considered as a factor in the determination of commercial reasonableness. But a reasonable jury could have disagreed with the district court's emphasis on the factor. Most importantly, the court's factual premise, that Terrey testified that he was not interested in the contracts, is simply incorrect. There is no testimony of Terrey to this effect. It was *Swidelsky* who made the statement with reference to the history of the business during his pretrial deposition. If the jury recalled the testimony correctly, then, it could have reasonably concluded that Terrey's failure to present the contracts resulted from the agency's apparent lack of interest in them.[10] Such an inference would constitute a factor against finding the disposition to be commercially reasonable.

Third, although the agency enjoys discretion in selecting the manner of disposition of collateral, the commercial reasonableness standard may at times require the agency to expend its resources in search of a private purchaser. The Texas courts have recently held that the creditor under § 9.504 has the fiduciary duty to make a sincere effort to obtain the full market value for the assets. *Christian v. First National Bank,* Tex.Civ.App.1975, 531 S.W.2d 832, 832. The analogy to § 2.706 supports the imposition of such a duty. Both sources therefore preclude a holding as a matter of law that the SBA owed no duty to expend its own resources in search of a private

buyer of the company. Whether the SBA owed such a duty in this case as a matter of fact is a question about which reasonable men could disagree on this record. Regarding the potential for vandalism, the record does not indicate that the agency had confronted such a problem or had expended any resources in prevention. The jury could reasonably infer that these supposed costs would not have burdened the SBA. If a diligent search for a private buyer would have delayed the disposition, the only certain expense of the delay would have been additional rent payments of $500 a month. The defendant's expert testified that such an expense reasonably should not have inhibited attempts to negotiate a private sale. The jury therefore had a basis on which to disregard the extra rent as it assessed the agency's behavior.

Besides the preceding objections to the district court's holding, the record also suggests several additional factors on which the jury could have reasonably relied to conclude that the SBA did not liquidate SESO in a commercially reasonable manner. First, although Swidelsky admitted that the SBA usually pursued private sales of assets and turned to public auctions only as a last resort, the agency decided to auction the SESO assets only two days after Terrey turned over the collateral. No history of the business had been taken, no inventory listed, no appraisal made, no competitors contacted. The jury could reasonably have concluded that such hasty action disregarded the relevant trade practices and usages, which usually included searching for private purchasers of collateral.

Second, the agency did not negotiate even for the private sale of two nearly completed signs, which the defendant contended could have been sold for $56,000. Negotiations for these signs could have occurred during the two-month period from the November 19 meeting to the auction. The record would support an inference by the jury that this failure to negotiate oc-

---

10. On redirect examination Terrey testified that he had informed Swidelsky of the contracts for the sale of signs under construction but that Swidelsky was not interested in the agreements.

curred because the agency was not interested in realizing any more than the auction would bring for the collateral. The jury could reasonably conclude that this was hardly the conduct owed by one standing in a fiduciary relationship to Terrey, especially when the remaining debt was seven times the estimated auction value of the collateral.

Third, the agency refused to postpone the auction for three weeks to give American Time, a prospective purchaser of the business, the opportunity to consider the sale. The delay would have cost $500, one month's rent. According to Terrey, American Time had discussed a sales price as high as $110,000. Given the expert's testimony that such a refusal to postpone was unreasonable, a jury could sensibly have reached the same conclusion.

Fourth, Swidelsky told Terrey that the agency would discuss a sale to American Time only if the company advanced a firm offer to purchase for at least $50,000. When the estimated auction value of the collateral was only $15,000, the jury could have concluded that the agency had unreasonably burdened the negotiations by such a requirement.

Fifth, the amount realized from the auction, $23,865.67, was substantially less than either the remaining debt of $94,634.46 or the alleged sale price to American Time of $110,000, or the alleged market value of the two nearly completed signs of $56,000, or the alleged market value of all of the inventory and equipment of $121,300. These disparities alone could not justify a finding by the jury that the agency acted unreasonably, but they could reasonably constitute one factor in support of that finding.

In conclusion, under Texas law the SBA had the duty to dispose of the SESO assets in a commercially reasonable manner. If a jury concluded that the five preceding factors accurately reflected the agency's conduct in disposing of the assets, it could reasonably have concluded that the disposi-

tion was not commercially reasonable. There is no legal basis to preclude this conclusion.

The judgment of the district court is REVERSED and the case REMANDED for a new trial.