UNITED STATES of America

v.

**PROGRESSIVE DRUG COMPANY and Walter G. Lagerquist, Jr.**

No. SA76CA95.

United States District Court,
W. D. Texas,
San Antonio Division.

Dec. 7, 1978.

Jeremiah Handy, Asst. U. S. Atty., San Antonio, Tex., for plaintiff.

Frank D. Masters, San Antonio, Tex., for defendants.

## JUDGMENT

SPEARS, District Judge.

This matter came on for trial before the Court on the 24th day of October, 1975.

The Small Business Administration, hereinafter referred to as "S.B.A.", an agency of the United States Government, sought judgment against Progressive Drug Company, hereinafter referred to as "Progressive", in the amount of $101,951.66, plus interest thereon at the daily rate of $21.2107 from October 15, 1975, until paid, and against Walter G. Lagerquist, Jr. in the amount of $76,825.00. After hearing the evidence, it appears to the Court that two issues call for resolution. The first is whether the actions of the S.B.A. in seizing the assets of Progressive on November 27, 1975, were taken pursuant to lawful authority. In this connection, a history of the relationship between the parties is necessary.

On January 24, 1972, defendant Progressive Drug Company, by and through its president, Walter G. Lagerquist, Jr., executed a promissory note in the amount of $175,000.00, payable to the order of the Alamo National Bank of San Antonio, Texas, hereinafter referred to as "Bank". Contemporaneous with the execution of the note, a "Small Business Administration Loan Agreement" between the Bank and the S.B.A., a security agreement covering accounts and contract rights, and a security agreement covering inventory, each naming the Alamo National Bank of San Antonio as the secured party, were also signed by Mr. Lagerquist as president of Progressive. In addition, and on the same date, Mr. Lagerquist executed a "Small Business Administration Guaranty", by which he undertook a personal guaranty of Progressive's indebtedness to the Bank to the extent of $76,825.00.

Under the terms of the above referred to note, payments thereon were to be made on the 24th of each month. No payment was made on November 24, 1974. On November 26, 1974, Mr. Lagerquist called the Bank to discuss the possibility that the Bank might foreclose on the company and allow it to stay open and operate on a "bonded warehouse" basis. Later that day, Mr. Gilmer Williams, a vice president of the Bank, called Mr. Anthony S. Reyna, a loan officer at the S.B.A. office in San Antonio, and requested that the S.B.A. take over and liquidate Progressive's assets. The next day, November 27, 1974, Mr. Williams wrote a letter to the S.B.A. requesting that the S.B.A. purchase its 85% participating interest in the note. The letter also stated "[y]ou are hereby authorized to liquidate subject loan and dispose of assets and collateral as needed."

During the afternoon of the 27th, Mr. Reyna, Mr. Charles D. Richardson, and another S.B.A. officer went to Progressive's business premises at 114 Stumberg in San Antonio. They were there when Mr. Lagerquist returned from lunch, at which time he was informed of their intention to lock the doors of the business, which they proceeded to do without any objection, challenge, or argument from him. The doors, except those leading to Mr. Lagerquist's personal offices and those of his staff, were padlocked, and "no trespassing" signs were posted around the premises. A security guard was also placed on the premises to protect the inventory, particularly that portion of the inventory consisting of controlled substances.

On December 2, 1974, the November 27, 1974, letter from the Bank was received by the S.B.A. On December 5, 1974, the S.B.A. wrote the Bank, and requested immediate assignment of the note and related agreements to the S.B.A. Mr. Williams evidenced his agreement to the arrangement, including acceleration of the note, seizure and sale of all collateral, and the obtaining of a deficiency judgment, by signing a statement to that effect at the bottom of the December 5 letter on December 9, 1974. On December 6, 1974, the S.B.A. mailed a notice of acceleration and demand for payment of the $116,162.64 outstanding balance on the note to Mr. Lagerquist, as president of Progressive. On December 12, 1974, the Bank formally assigned the note and security agreements of Progressive to the S.B.A. without recourse. A similar formal assignment of Mr. Lagerquist's personal guaranty was made on December 18, 1974.

Progressive contends that since the S.B.A. was not the holder of the note, the security agreements, or the guaranty on November 27, 1974, it had no legal authority to seize the assets of the business on that date. The Court finds no merit in this position. Although the S.B.A. did not have the status of assignee of the rights of the Bank under the security agreements on November 27, 1974, it had been requested by the Bank to take possession of the collateral and begin proceedings to liquidate same. An agency relationship was thus created through which the S.B.A. had the authority to proceed as it did. No question concerning the S.B.A.'s authority to seize and liquidate Progressive's assets was raised at the time of seizure by any of the company's employees. In fact, as late as February 11, 1975, Mr. Lagerquist, who is a practicing attorney in San Antonio, wrote the S.B.A., stating "I recognize this obligation, of course, and would like to arrange to discharge it." In addition, on November 27, 1976, it was obvious to the Bank and the S.B.A. that time was of the essence in pursuing their right to seize Progressive's assets. Mr. Lagerquist had proposed to the Bank that it should foreclose on the company's inventory in order that trade creditors, some. of whom had begun legal actions to collect their accounts, could not disrupt the company's business by conducting piecemeal foreclosures on the inventory. Faced with a situation where the business was hurtling downward at an accelerating pace, and where the inventory available for satisfaction of the secured party's interest was imperiled by an increasing trend on the part of trade creditors to begin protecting their own interests, the actions of the Bank and the S.B.A. appear reasonable in every respect in taking steps to protect the collateral available for satisfaction of Progressive's indebtedness from waste. On these facts, the Court holds that the actions of the S.B.A. in seizing and proceeding to liquidate the assets of Progressive were proper and reasonable under the circumstances, and were taken pursuant to lawful authority.

The second question before the Court involved the commercial reasonableness of the liquidation of Progressive's assets. The many factors to be considered by the Court in evaluating the commercial reasonableness of a public liquidation sale of the assets of a business which have been seized after default appear in *United States v. Terrey*, 554 F.2d 685 (5th Cir. 1977). Before detailing the application of the *Terrey* standards to the case at bar, a recital of relevant facts is necessary.

After the November 27, 1974, seizure of Progressive's assets by the S.B.A., the business operations of the company as a going concern halted. Progressive's employees remained on the job until December 30, 1974, and during that period they pursued collections of accounts receivable and assisted to some degree in attempting to find a private buyer for the company's assets. The S.B.A.'s efforts to find such a buyer proved fruitless, except for the sale of some of the controlled substances. During this period the S.B.A. was incurring expense for rent, utilities, and a security guard who was on the premises to protect the inventory, particularly the controlled substances, from vandalism. In addition, much of the inventory of the prescription drugs carried by Progressive was dated, and threatened to become worthless with the passage of time. Although the testimony reflected that normal practice in the drug business included an arrangement with manufacturers whereby expired drugs were exchanged without charge for fresh products, since Progressive was carrying substantial delinquent trade accounts with its suppliers, they proposed to repossess the expired product in exchange for credits on Progressive's accounts with them. Such an arrangement, if agreed to by the S.B.A., would have depleted the inventory available to the S.B.A. to satisfy Progressive's obligation to it. Accordingly, the S.B.A. did not agree.

Faced with the deterioration of a portion of the company's inventory, on December 26, 1974, the S.B.A. posted notice at the company's office, the Bexar County Courthouse, the San Antonio City Hall, and the Main Post Office in San Antonio that the assets of the company would be sold at

public auction on January 2, 1975. In addition, local wholesalers were notified by telephone of the sale. No written notice was given to the debtor. On the date specified, the only persons who responded to the notices were interested in the company's equipment and safe. The S.B.A. thus entered a protective bid and purchased all of the assets itself.

■ The defendants herein challenge the January 2, 1975, sale, particularly because no written notice was given to them. However, since the main reason for holding the sale on this date was to dispose of assets that were at least in part perishable in nature, the notice requirement in this instance could reasonably be construed to fall within the provisions of *Tex. Bus. & Comm. Code* § 9.504(c), which state that no notice to a debtor is necessary where the sale in question involves perishable assets. In any event, failure of the S.B.A. to comply with notice requirements with respect to the January 2, 1975, sale at most creates a rebuttable presumption that the amount received at the sale equals the amount of the debt, with the burden on the secured party to prove that the fair market value of the goods sold was less than that amount. *United States v. Whitehouse Plastics*, 501 F.2d 692 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 7 (1975), In this case, the Court finds that such a presumption has been rebutted by the holding of a second sale on January 30, 1975, after notice to the debtors.

The commercial reasonableness of the January 30, 1975, sale is an independent source of controversy. After the January 2 sale, the S.B.A. contacted the firm of Ernest St. Clair, Auctioneers, located in Amarillo, Texas, to arrange a public auction on Thursday, January 30 at 10:00 A.M. While there was no inventory taken for the January 2 sale, a "walk-through" inventory was conducted for the January 30 sale. Likewise, while there was no appraisal made for the January 2 sale, an appraisal of $64,-000.00, representing the wholesale cost of the inventory, was obtained. The source of the appraisal was not disclosed at trial.

Advertisements for the sale were mailed to a list of prospective purchasers compiled from mailing lists from prior sales and current telephone directories in Austin, Houston, and San Antonio, including the towns surrounding San Antonio. Newspaper advertisements were placed in both major San Antonio dailies, and Austin, Dallas, and Oklahoma City papers were also used. The merchandise offered was displayed for inspection one day prior to the sale.

At the sale on January 30, approximately fifty interested bidders appeared and registered. Bids were taken on a bulk basis, and then on a piecemeal basis, on the inventory and equipment. The bulk offering brought a higher bid than did the piecemeal bidding on the inventory, and the bulk bid was accepted. The fixtures were sold on a piecemeal basis. A total of $21,570.00 was collected, which resulted in a net to the S.B.A., after deduction of expenses, of $17,-833.73.

The defendants claim that the process by which the assets of the company were disposed of, including the two sales, was not commercially reasonable for several reasons, the foremost of which is that no private sale was attempted. In this connection, they claim that no history of the business was taken and no search for a private buyer was conducted. In order to put this argument in perspective, however, it must be noted that a history of the company's business was available from the files of the Bank and the S.B.A. The history which can be extracted from those files indicates that the company was suffering financial distress at least as early as September of 1973, and that a search for a private buyer had been conducted by the company itself since early 1974. The evidence at trial established that only one of these, Bindley Western Drug Company, Inc., hereinafter referred to as "Bindley", was seriously interested. In July of 1974, Progressive circulated a notice to its creditors soliciting acceptances of an informal composition of debt, which was regarded as a prerequisite for a successful arrangement with Bindley. It is apparent from the testimony of Mr. Lager-

quist at trial and from a letter, dated November 14, 1974, from Mr. Jack E. Laughner, executive vice-president of Bindley, to Mr. George Reebe, executive vice-president of the Bank, that there was no possibility of a merger or purchase on the date the S.B.A. seized the company's assets. It is apparent that the company had exhausted all possibilities in this area, and that duplicative efforts by the S.B.A. would have been unproductive.

The defendants also seek to challenge the commercial reasonableness of the disposition of Progressive's assets by claiming that on November 25, 1974, the company had accounts receivable in the amount of $75,436.00. No indication of the nature and collectability of these accounts was given, although it was established that the S.B.A. collected only slightly over $3,000.00. The Court is of the opinion that when weighed in connection with the other evidence in the case, this factor is not of such significance that it should affect the Court's overall findings concerning the disposition of Progressive's assets.

Based on all of the foregoing factors, the Court finds that the S.B.A.'s disposition of the assets of Progressive Drug Company was conducted in good faith and in a commercially reasonable manner. It is, of course, unfortunate that the proceeds realized by the S.B.A. from the disposition efforts were insufficient to cover the amount owed by the debtors, but the Court is convinced that the S.B.A. acted reasonably in pursuing its chosen course of conduct in this case.

It is, therefore, ORDERED, ADJUDGED and DECREED that the Small Business Administration have and recover from Progressive Drug Company the amount of $101,951.66, plus interest thereon at the daily rate of $21.2107 from October 15, 1975, until paid, and that the Small Business Administration have and recover from Walter G. Lagerquist, Jr. $76,925.00 of such amount as personal guarantor of the indebtedness of Progressive Drug Company.