**UNITED STATES of America,**
**Appellant,**

v.

**CONRAD PUBLISHING COMPANY, a corporation, the Estate of Currie Conrad, John G. Conrad and Charles Conrad, Appellees (Two cases).**

**Nos. 78–1251, 78–1290.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1978.

Decided Dec. 29, 1978.

Gibson, Chief Judge, filed a dissenting opinion.

Allan Gerson, Atty., App. Sec., Civ. Div., Dept. of Justice, Washington, D. C. (argued), Barbara Allen Babcock, Asst. Atty.

Gen., Washington, D. C., James R. Britton, U. S. Atty., Fargo, N. D., and Ronald R. Glancz, Washington, D. C., on brief, for appellant United States.

William C. Kelsch of Kelsch, Kelsch & Tudor, Mandan, N. D., argued and on brief, for Conrad Publishing Co.

Before GIBSON, Chief Judge, and LAY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The United States brought this action in order to collect the balance due on a promissory note given by Conrad Publishing Company and assigned to the Small Business Administration (SBA). It sought to recover $63,816.76 from the Company and the guarantors of the note, Charles Conrad, John Conrad and Currie Conrad.[1] This amount represented the deficiency remaining after the sale of the Company's assets and real property. The District Court determined that the SBA did not conduct the sale of the Company's assets in a commercially reasonable manner as required by N.D.Cent. Code § 41–09–50(3), U.C.C. § 9–504(3). It found that a proper sale would have brought an additional $40,789.58 and deducted that amount from the deficiency. A judgment of $26,554.28 was entered against the Company and the three Conrad guarantors. The United States appeals from this judgment, claiming that it is entitled to recover the entire deficiency. The Company and the guarantors cross-appeal from the measure of damages utilized by the District Court. We affirm in part, reverse in part and remand for further proceedings.

On March 7, 1968, Conrad Publishing Company borrowed $225,000 from the Bank of Burleigh County, Bismarck, North Dakota. The promissory note, evidencing the loan, was subsequently assigned by the bank to the SBA, an agency of the United States. The loan was secured by a mortgage on certain real property owned by the Company, a security agreement covering primarily the Company's equipment, and personal guarantees executed by Charles Conrad, John Conrad and Currie Conrad.

Conrad Publishing defaulted on April 4, 1975, at which time there was a balance due on the note of approximately $105,000. The SBA and the bank immediately took possession of all of the Company's assets. A foreclosure sale of all of the collateral was scheduled for May 6, 1975.

On April 23, 1975, the SBA contacted eleven North Dakota auctioneers and requested bids to conduct the sale. Only two auctioneers responded. One, Mr. Fitzgerald, refused to bid. He explained his refusal as follows:

Here it is April 26th, Saturday, and you have the sale date as of May 6th. I find it impossible to do the right kind of a job of advertising in such a short time, and a poor job of advertising is no good for any kind of a sale. I just can't do business that way so I will not be bidding on this sale. Maybe some other time.

The other, Mr. Berg, submitted a bid. Berg was hired as auctioneer for the sale on April 25, 1975, only seven days before the sale.

The total advertising for the sale consisted of mailing seven letters to printers, the distribution of six hundred handbills, and one advertisement in both the Bismarck Tribune and the Fargo Forum. No advertisements were placed in trade journals or in out-of-state newspapers. There were one hundred eighteen registered bidders at the auction. Of approximately seventy-five to eighty-five publishers in fifteen to twenty-five job printers in North Dakota, only eighteen were represented at the sale.

The Conrads estimated that the value of the equipment at the time of the sale was $165,000. John West, of the SBA, "guesstimated" that the value of the equipment was $50,000. No professional appraisal of the equipment was made. Approximately thirty minutes before the auction began, a Mr. Malone made an oral bulk bid for $101,-

---

1. Currie Conrad died subsequent to the commencement of the action. His estate was substituted as the party defendant.

000. West requested that Malone support the offer by guaranteeing a down payment of between $10,000 and $15,000. No guarantee was made and West concluded that the offer was not bona fide.

The auction began and the equipment was sold in a piecemeal fashion. Much of the equipment was sold at a price significantly lower than its estimated value. Donald Gackle, an independent publisher, testified that one of the principal items for sale—a four-unit Fairchild press—was worth between $13,000 and $25,000. Gackle was interested in obtaining the press as trading stock. Prior to the auction, he had contacted two printing equipment dealers who stated that they would allow him $13,-000 as a trade-in value. Gackle was the only individual to bid on the press and he purchased it for $2,500. A photoprinting machine, which cost $34,925 in 1967, was sold for $106. A sticher, that had a value of several thousand dollars, was sold for $75. Gackle testified that cameras "went for ridiculously low prices."

Part of the problem was that there were few buyers who were interested in printing equipment.[2] Another source of the problem was the inexperience of the auctioneer. Berg was unfamiliar with the operation of the equipment, its value or its intended use. The bidders were required to identify certain items auctioned off since Berg was unable to do so. The SBA did not furnish Berg any expert assistance.

The sale of the Company's personal property resulted in gross proceeds of $22,-524.67. After deducting $6,241.81 in expenses, the net proceeds were $16,283.19. The net proceeds were applied against the balance due on the note payable. At a later date, the government foreclosed on the real property of the Company. The foreclosure sale netted $27,863.51 which was also used to reduce the balance due on the note.[3] A deficiency of $63,816.76 remained.

The government argues, initially, that the District Court erred in applying the Uniform Commercial Code to the transaction. It maintains that the District Court should have used the "federal law of contracts" in which the terms of the contract are controlling. The note payable stated that

[The SBA] is empowered to sell, assign, and deliver the whole or any part of the Collateral at public or private sale, without demand, advertisement or notice of the time or place of sale or of any adjournment thereof, which are hereby expressly waived.

The guarantee signed by the Conrads stated that

[The SBA] may elect, at any public or private sale or sales, for cash or on credit or for future delivery, without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law) * * *.

Thus, the government contends, the Company and the guarantors waived their rights to have the sale conducted in a commercially reasonable manner. The Company's and the guarantors' sole recourse was to claim that the SBA's actions in conducting the sale were unconscionable.

The District Court determined that the transaction was governed by the U.C.C. as adopted by North Dakota either "by virtue of the fact that the U.C.C. is the common law of the federal courts * * * or by virtue of the fact that state commercial law controls the rights of the parties." It concluded that the waiver of rights found in the note and in the guarantees was limited by N.D.Cent.Code §§ 41–09–47(3)(b), 41–09–50(3), U.C.C. §§ 9–501(3)(b), 9–504(3), and that the requirement of a "commercially reasonable" sale of collateral could not be waived. The District Court further concluded that although N.D.Cent.Code § 41–09–47(3), U.C.C. § 9–501(3), allows parties

---

**2.** Gackle testified that: "The right people weren't buying. There just weren't enough of the good buyers. Those who were interested in that kind of equipment."

**3.** The parties do not contest the reasonableness of the foreclosure sale.

to substitute other reasonable standards in a contract for the statutory standards, the purported waivers provided no standards whatsoever. Thus, the sale had to be examined for its compliance with the "commercially reasonable" test presented by statute.

▪ We agree with the government that federal law, rather than state law, controls the rights and obligations of the parties. *See United States v. Beardslee,* 562 F.2d 1016, 1022 (6th Cir. 1977), *cert. denied,* —— U.S. ——, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978); *United States v. Marshall,* 431 F.Supp. 888, 890 (N.D.Ill.1977); 13 C.F.R. § 101.1(d). *Cf. United States v. Hext,* 444 F.2d 804, 807–809 (5th Cir. 1971). We must still determine, however, whether we should use the U.C.C. as adopted by North Dakota as the federal rule, or whether we should use the federal common law rule suggested by the SBA.

▪ In the absence of some overriding federal interest in uniformity, the applicable state law generally provides the rule of decision. *See United States v. Yazell,* 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966); *United States v. Marshall, supra* at 891. We find no such overriding federal interest here. Many SBA loans are negotiated with the assistance of local banks and, in most transactions, the SBA has consistently "as a matter of convenience" operated as if the local U.C.C. was legally applicable. In this case, the SBA obtained a security agreement from the Conrads and filed a financing statement. It gave the Conrads notice of the auction. There is no evidence that this policy has, in any manner, adversely affected federal fiscal interests. To the contrary, the SBA, in this case, relied on its prior perfected security interest under the North Dakota U.C.C. to maintain priority over other creditors of Conrad Publishing.

▪ There is no evidence that the SBA's ability to smoothly process loan transactions will be seriously hampered. The SBA already utilizes local procedures to implement its programs, especially for recordation and notification purposes. 13 C.F.R. § 101.-1(d)(3). In view of the near universal adoption of the U.C.C.,[4] there is little danger that the SBA will unreasonably be subjected to a wide variety of conflicting state procedures. The applicable provisions of the North Dakota U.C.C. do not display any aberrational features that would defeat a legitimate federal interest and that would necessitate our resorting to federal common law. *Cf. Occidental Life Insurance Co. v. EEOC,* 432 U.S. 355, 367, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). Thus, we conclude that the District Court did not err in applying the U.C.C., as adopted by North Dakota, to the sales transactions.[5]

▪ We note, moreover, that even if circumstances dictated that we resort to federal common law, we would decline to adopt the "federal law of contracts" rule proposed by the government. The U.C.C. has become the source of general commercial law. It represents the latest attempt to achieve uniformity in commercial transactions. *See generally* F. Whitney, The Law of Modern Commercial Practices §§ 26–30 (2d ed. 1965). The U.C.C. has become the source of federal common law in the area of commercial transactions, *see United States v. Hext, supra,* at 809–811, and, as such, it would be inappropriate for us to fashion a specialized body of law applicable only to sales of collateral conducted by the SBA. Thus, when developing a federal common law rule with respect to commercial transactions, we shall be guided by the relevant portions of the U.C.C.

▪ The government also argues that the District Court erred in finding that the sale was not commercially reasonable in

---

4. The U.C.C. has been adopted in forty-nine states and the District of Columbia. Louisiana has adopted only Articles 1, 3, 4 and 5. 3 U.L.A. Table 1 (Supp.1978).

5. We agree with the District Court that the parties could not waive the right to have the

sale conducted in a commercially reasonable manner. We also agree that the language in the note and the guarantee did not determine alternative standards by which the fulfillment of the parties' rights and duties could be measured.

accordance with N.D.Cent.Code § 41–09–50(3), U.C.C. § 9–504(3).[6] Whether a sale of collateral was conducted in a commercially reasonable manner is essentially a factual question. *See Liberty Nat. Bank & Tr. Co. of Okl. City v. Acme Tool, etc.*, 540 F.2d 1375, 1381–1382 (10th Cir. 1976); *California Airmotive Corporation v. Jones*, 415 F.2d 554 (6th Cir. 1969); *Pruske v. National Bank of Com. San Antonio*, 533 S.W.2d 931, 937–938 (Tex.Civ.App.1976); 4 R. Anderson, Uniform Commercial Code § 9–504:28 (2d ed. 1971). As such, the District Court's finding that the sale was commercially unreasonable should be judged under the clearly erroneous standard.[7] Fed.R.Civ.P. 52(a).

The evidence shows that the SBA made no genuine effort to reach the market best able to use the equipment. The time between the selection of the auctioneer and the auction date was too short of a period for an effective advertising effort. Fitzgerald, one of the auctioneers solicited by the SBA, refused to submit a bid because the brief time span permitted only "a poor job of advertising." Printing equipment is marketed on a regional or national level. Time was needed to place advertisements in national trade publications and other regional publications. Time was needed to notify regional and national printing equipment dealers. These potential customers also needed time to decide whether to attend the auction and to make travel arrangements. Seven days were simply too short of a period to try and reach this market. The District Court's finding that there was insufficient lead time for the advertising is not clearly erroneous. The advertising that was done was unreasonably limited in scope. Only seven letters were sent to North Dakota publishers. Only two advertisements were placed in North Dakota newspapers. There were only six hundred handbills distributed. Gackle's testimony demonstrates that it would have been a simple matter to contact printing equipment dealers to secure bids. The small amount of printers at the auction can be explained, in part, by poor scheduling. The auction was held on Tuesday. Most weekly newspapers in North Dakota are published on Wednesday and Tuesday is typically the busiest day of the week.

■ The SBA did not furnish the auctioneer with any technical assistance. In view of the highly sophisticated nature of the equipment, the failure to furnish technical assistance is another factor showing commercial unreasonableness. The disparity between the prices received at the auction and the estimated value of some of the equipment, although not dispositive, is an additional factor showing commercial unreasonableness. *See United States v. Terrey*, 554 F.2d 685, 693 (5th Cir. 1977). We conclude that the District Court was not clearly erroneous in determining that the sale was not conducted in a commercially reasonable manner. *See Liberty Nat. Bank & Tr. Co. of Okl. City v. Acme Tool, etc., supra.*

---

**6.** N.D.Cent.Code § 41–09–50(3), U.C.C. § 9–504(3), provides in relevant part:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. * * * [N]otification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of any interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations, he may buy at private sale.

**7.** The parties conceded at oral argument that the clearly erroneous standard was the proper test.

The District Court determined that a commercially reasonable sale of the Fairchild press, the photoprinting machine, and the Friden punch machines would have resulted in an additional amount of $21,285. It also determined that the auction brought in only fifty percent of the amount that could have been realized on a properly handled sale. The District Court calculated that the loss on the balance of the equipment was $19,504.58. Both parties argue that there is no evidentiary basis for the District Court's damage findings, except in the case of the Fairchild press. We have carefully examined the record and agree with the parties.

■ We remand to the District Court in order to determine the "loss caused by a failure to comply with the provisions of [Article 9]." N.D.Cent.Code § 41–09–53(1), U.C.C. § 9–507(1). The fact that the government made the sale in a commercially unreasonable manner gives rise to a presumption that the value of the property if properly sold equalled the amount of the deficiency. *Beneficial Finance Co. of Black Hawk County v. Reed*, 212 N.W.2d 454, 460 (Iowa 1973); 4 R. Anderson, Uniform Commercial Code § 9–504:10 (2d ed. 1971). Thus, on remand, the government has the burden of showing that in a proper sale, the collateral would not have brought enough to satisfy the deficiency. *Beneficial Finance Co. of Black Hawk County v. Reed, supra.*

The judgment of the District Court is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

### GIBSON, Chief Judge, dissenting.

I agree with the majority opinion in holding that the United States should follow the general provisions of the Uniform Commercial Code,[1] and that the "commercially reasonable" provision of the Code could not be waived. However, in my view the United States has complied with the requirement of U.C.C. § 9–504(3) that "every aspect of the disposition (of collateral), including the method, manner, time, place and terms" be reasonable. The contrary finding of the District Court is clearly erroneous.

The test of whether a disposition of collateral is reasonable requires an examination of the entire factual situation. *C. I. T. Corporation v. Lee Pontiac, Inc.*, 513 F.2d 207, 210 (9th Cir. 1975); *In re Zsa Zsa Limited*, 352 F.Supp. 665, 670 (S.D.N.Y. 1972), *aff'd mem.*, 475 F.2d 1393 (2d Cir. 1973). We are primarily concerned with the *procedures* employed by the secured party rather than the *proceeds* obtained. *In re Zsa Zsa Limited, supra*, 352 F.Supp. at 671; U.C.C. § 9–507(2). The secured party need only act reasonably; it is not an insurer of a hypothetical expected return. *In re Zsa Zsa Limited, supra*, 352 F.Supp. at 672.

Turning to the present case, it is apparent from the guarantors' brief and the majority opinion that only three aspects of the sale are challenged as unreasonable. First, it is contended that insufficient advertising preceded the sale. Second, it is argued that an expert in printing equipment should have been hired to assist the auctioneer. Finally, the guarantors complain that the sale shouldn't have been conducted on a Tuesday. They attempt to show that these failing were unreasonable by claiming a scarcity of bidders and low prices.

The majority makes much of the shortness of the period between the selection of an auctioneer and the auction. They fail to recognize that during this time the auctioneer sent letters to the printers most likely to be interested in the property. Over 600 handbills were distributed and advertisements appeared in two leading newspapers in North Dakota. In short, considerably more advertising was done in this case than in most sales of distressed goods. It is also clear that the advertising reached many interested persons.

1. In addition to the majority's rationale it is significant that the United States treated the U.C.C. as applying during most of its dealings with the defendants. That is a separate basis for applying the U.C.C. as the correct statement of federal law in this case. *United States v. Terrey*, 554 F.2d 685, 693 (5th Cir. 1977).

It is also impossible to view the failure to hire expert assistance for the auctioneer as unreasonable. The defendants concede that Mr. Berg, who called the sale, is a competent North Dakota auctioneer. While he may have misnamed some of the printing equipment, it is obvious that the machinery was present and potential bidders were aware of how it operated and what function it served. The only certain result from hiring an expert to assist Mr. Berg would have been greater expenses to be deducted from the sale proceeds.

Finally, the guarantors complain that the sale should not have been conducted on Tuesday because small weekly newspapers in North Dakota distribute their papers on Wednesday or Thursday. If the sale had been held on Wednesday, the same argument would have been advanced. The simple fact is that some complaint could be raised as to any day of the week. They have not shown that any local custom prohibited Tuesday sales.

The contention that the auction should have been on a different day is related to the claim that likely buyers did not attend the sale. The majority notes that one hundred eighteen persons registered as bidders; however, the majority fails to recognize that in a typical sale of foreclosed property one hundred sixteen fewer would have attended. Eighteen of the approximately one hundred publishers and job printers in North Dakota were represented at the auction. In my view, that number far exceeds the minimum to be expected at a reasonably run auction of distressed goods.

I believe the majority and the District Court also erred in analyzing the evidence of the prices paid for goods at the sale. It is difficult to comprehend how the disparity between the price received at the auction and the estimated value of the goods can show unreasonableness when the majority concludes that there was no evidentiary basis for the District Court's damage findings, except in the case of the Fairchild Press. Putting aside that incongruity, the majority's recitation of the value evidence reveals the weakness of the evidence. *Ante*, at 951–952. There was evidence of the trade-in value of the Fairchild Press; however, it is common knowledge that trade-in values are almost always inflated. The cost of various machines when purchased years earlier was considered by the District Court despite the fact that at a foreclosure sale one buys used machinery "as is" with little, if any, practical recourse in case of malfunction. Finally, there was testimony that cameras "went for ridiculously low prices." Cameras are not limited to use by publishers or printers. The fact that a witness testified that the camera prices were low only establishes that the witness was unfamiliar with prices paid at complete dispersal sales of used equipment.

In sum, I believe that the sale in this case met reasonable commercial standards. One must not forget that in cases where deficiency judgments can be obtained and satisfied, the costs of the sale will be paid by the debtor. If extraordinary advertising or expert assistance is required by the courts, secured parties will become even more cautious in foreclosure situations. The expenses of sale will rise in all cases including those where the benefits may be outweighed by the additional expenditure of funds.

The standards enunciated in the majority opinion for a "commercially reasonable" sale would not be met in 99% of the foreclosure sales held in this country. This places an unrealistic burden on the lender and does a disservice to future borrowers as undoubtedly the imposition of a too stringent standard on foreclosure sales would operate to discourage lenders in the commercial field and further enhance the risk factors with a resultant increase of cost to the debtor.

The lender is charged with operating in good faith in the foreclosure of collateral and the facts here demonstrate in my view that the SBA did act in good faith in attempting to maximize the return on this distressed collateral. In these situations the borrower also has a stake in securing a fair return at the foreclosure sale and should also take steps to secure prospective purchasers for his own benefit. The bor-

rower here contended that the property was worth far in excess of the amount of the debt. These contentions are commonly asserted, but in such situations where the collateral is actually in excess of the debt, the debtor can usually make a sale before reaching the foreclosure stage. My main concern here is the impact that too stringent a standard on what is "commercially reasonable" will have on the future operation of the law merchant as codified in the U.C.C.

It is extremely important to note that the Conrads had notice of the proposed sale fourteen days before it occurred. One of the purposes of such notice is to permit the debtor or guarantor to protect his interest by finding buyers for the property. In my view, if extraordinary advertising or other expenses are to be incurred, it should be done at the discretion and in the judgment of the debtor or guarantor rather than the secured party. The debtor or guarantor is more likely to know what expenditures will be offset by increased sale proceeds. Since he ultimately pays the price, the debtor or guarantor ought to have some control over the purse strings on extraordinary sale costs.

I would reverse and grant the SBA judgment for the full amount of the deficiency.

Kennedy, Circuit Judge, filed a concurring opinion.