**UNITED STATES of America, Plaintiff-Appellant Cross-Appellee,**

v.

**John Junius SIMS et al., Defendants,**

**Lois E. Sly, Executrix of the Last Will and Testament of Howard B. Sly, Defendant-Appellee Cross-Appellant.**

**No. 75–4424.**

United States Court of Appeals, Fifth Circuit.

Dec. 21, 1978.

---

Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Jr., Asst. U. S. Atty., Jackson, Miss., for plaintiff-appellant cross-appellee.

T. Eugene Caldwell, Thomas G. Lilly, Joseph P. Wise, Jackson, Miss., for defendant-appellee cross-appellant.

Before COLEMAN, SIMPSON and TJO-FLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The Small Business Administration (SBA), after proceeding against the collateral securing a defaulted $350,000 loan, brought this suit [1] for the deficiency against

---

1. The United States of America was the named plaintiff, the jurisdiction of the district court being invoked under 28 U.S.C. § 1345 (1976), which provides:

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

the three makers of the loan[2] and the executrix of the estate of a guarantor.[3] A default judgment for the full deficiency, $16,877.24, was entered against each of the makers. Following a bench trial, the district court entered judgment against the executrix but, for equitable considerations, reduced her liability to one-fourth of the deficiency. On the executrix's crossclaim against the makers, she was awarded judgment for that one-fourth amount.

The principal issue presented at trial and in the briefs filed on this appeal[4] is whether the SBA's release of some of the collateral without notice to the executrix operated to extinguish her decedent's obligations under the guaranty. A recent decision of this court, *United States v. Terrey*, 554 F.2d 685 (5th Cir. 1977), handed down subsequent to the proceedings in district court and the briefing on this appeal, is dispositive of the issue. Following the *Terrey* rationale, we must uphold the district court's conclusion that SBA's failure to give notice did not discharge the executrix and remand the case for the purpose of determining whether the fair market value of the collateral released without notice was sufficient to pay the debt it secured. If the fair market value of the collateral was sufficient, the executrix cannot be held liable on the guaranty; to the extent that the fair market value was not sufficient to satisfy the indebtedness, she is liable for the deficiency.

I

The evidence in this case is not in dispute, except as to the fair market value of the released collateral. On that issue, no probative evidence was adduced.[5]

On February 17, 1966, First National Bank of Jackson, Mississippi (the Bank), loaned $350,000 to the three Sims brothers, partners in a timber and sawmill business called Sims Enterprises. The loan was necessary to enable the partnership to purchase some sawmill machinery and equipment, costing in excess of $200,000, from Howard B. Sly, the executrix's late husband. The loan was evidenced by a note signed by the Simses and was secured by written guaranties of payment executed by each of the brothers and by Mr. Sly. The Bank received additional security from the borrowers: a deed of trust covering five tracts of land, totalling 1130 acres, in Smith and Jasper counties, Mississippi; a chattel deed of trust encumbering certain sawmill machinery and equipment; an assignment of $50,000 in life insurance on each of the Sims; and the assignment of the proceeds of a woodchip contract between Sims Enterprises and Masonite Corporation.

SBA participated in the loan to the extent of 75%. This participation was reflected in the interest provision of the note—on 25% of the loan the Bank was to receive interest at the rate of 8% per annum, and on the remaining 75% the SBA was to be paid at the rate of 4% per annum. The loan was to be amortized over seven years with monthly payments of $5053.00 beginning May 17, 1966.

Payments were made when due until the October 1966 installment. In July 1967, SBA consented to the Bank's granting of a

---

**2.** Three brothers: John Junius Sims, Herman Edward Sims and Thomas Harold Sims.

**3.** Mrs. Lois E. Sly, Executrix of the Last Will and Testament of Howard B. Sly, deceased.

**4.** The appeal was taken by the United States of America from the Corrected Order Altering Final Judgment entered by the district court on October 14, 1975. Record, vol. 1, at 300, 302. That order gave the Government judgment against the executrix for one-fourth of the deficiency and judgment in her favor against the makers for the same amount. The executrix has cross appealed, *id.* at 303, contending that she is entitled to a judgment of no liability.

The makers of the note are not parties to this appeal.

**5.** Though an SBA appraisal of the released collateral was filed with the district court, there was no competent evidence of the *fair market value* of that collateral. The district court expressed it as a "lack of admissible evidence of the fairness of the considerations for the releases." Record, vol. 1, at 161. Had competent evidence as to fair market value, at the time of release, been introduced, the district court could have determined whether the price paid SBA for the releases was reasonable under the circumstances.

six-month moratorium, without notice to Mr. Sly. Thereafter, the loan, as extended, remained approximately two months delinquent for over two years, though the monthly installments came in fairly regularly.

On April 23, 1969, Mr. Sly was killed in an airplane crash, and on May 2, 1969, letters testamentary were issued to his widow, Lois E. Sly, the executrix now before us. On June 13, 1969, the Bank made claim against Sly's estate for $247,088.24, the amount owing on the note which was then two months in default.[6] Later in that year, or early in 1970, the Bank, with SBA's consent, granted the Sims brothers another extension, this one for three months. The executrix was not notified of the extension. The last installment paid on the note came on June 18, 1970. The following month the sawmill closed, and Sims Enterprises ceased operations. In September 1970, SBA assumed the servicing of the loan. On December 15, 1970, SBA, by assignment without recourse, acquired the Sims' note and the collateral, including the Sly guaranty.

From the time Sims Enterprises went out of business until the commencement of this action in district court, SBA's collection efforts succeeded in reducing the principal balance due on the loan to $16,877.24, the amount sued for in these proceedings. Most of the reduction came from the proceeds of the collateral. SBA obtained $15,599.82 in the form of loans against the cash values of the assigned life insurance policies; $118,628.00 for releasing, in two separate transactions, its security interest in 1120 acres of the land under the deed of trust; and $68,456.33 from the foreclosure sale of the sawmill, equipment, and the remaining ten acres of the land encumbered by the deed of trust.

SBA's claim against the executrix was tried before the district court on a pretrial order that incorporated addenda, prepared by the parties, that purported to frame the legal issues central to the case. Record, vol. 1, at 116, 121, 131–33. The addenda failed to accomplish that purpose, and the case proceeded to trial without a joinder of issues. As the case progressed, what we consider to be the prime issue in the controversy—SBA's authority to release its security interest in the 1120 acres of land without notice to the guarantor—eventually surfaced. After considering the evidence presented by both sides, the district court, in its opinion of January 7, 1975, concluded that Sly's guaranty was valid and enforceable by SBA against his estate[7] and that neither Sly nor his executrix were entitled by the provisions of the guaranty to receive notice of the payment moratoriums that had been granted the Simses, notice of the ensuing default, or notice of SBA's releases of its security interest in the 1120 acres of land held in trust. *Id.* at 152–63. The court reached this conclusion by giving effect to language of the guaranty, quoted in the margin,[8] under which the guarantor

---

6. After SBA acquired the loan from the Bank, it too filed a timely claim against the estate. Record, vol. 1, at 150, 151.

7. The guaranty provided that the death of the guarantor would not discharge his responsibility:

"The undersigned further agrees that all liability hereunder shall continue notwithstanding the . . . death . . . of the undersigned . . . ."
Record, vol. 1, at 5.

8. The provisions of guaranty cited by the court for its conclusions are, in pertinent part:

The undersigned waives any notice of the incurring by the Debtor at any time of any of the Liabilities [e. g., the $350,000 Sims note] and waives any and all presentment, demand, protest or notice of dishonor, nonpayment, or

other default with respect to any of the Liabilities and any obligation of any party at any time comprised in the collateral.
Record, vol. 1, at 5, 154.

The *undersigned hereby grants to Bank full power, in its uncontrolled discretion and without notice to the undersigned, but subject to the provisions of any agreement between the Debtor or any other party and Bank at the time in force, to deal in any manner with the* Liabilities *and the collateral,* including, but without limiting the generality of the foregoing, the following powers:

(a) To modify or otherwise change any terms of all or any part of the Liabilities [e. g., the $350,000 Sims note] or the rate of interest thereon (but not to increase the principal amount of the note of the Debtor to Bank) to grant any extension or renewal

purported to waive, inter alia, notice of the payment moratoriums and notice of any default and to consent to the Bank's and SBA's, release of the collateral, without prior notice to the guarantor. In the court's view, the only limitation imposed on SBA's right to dispose of the collateral is the proviso that makes SBA accountable for any deterioration, waste, or loss of collateral "caused by the willful act or willful failure to act of Bank" or SBA [9], and no evidence was produced to bring that limitation into play. The limitation was considered by the court to be so narrow that SBA could not be called to answer for disposing of collateral, without notice, even at an inadequate price. *Id.* at 161–62. Consequently, it held meritless the executrix's contention that SBA's release of its security interest in 1000 (of the 1120) acres of land for $105,000, when the land was shown to be worth $160,000 a year later, should operate to discharge her from further liability under the guaranty. *Id.* at 160. The court reasoned that under the guaranty any objection to the adequacy of consideration realized for collateral was waived, *id.,* unless it could be demonstrated that "the consideration was so inadequate as to equate with fraud or gross negligence," *id.* at 161–62. Neither fraud nor gross negligence on SBA's part was proved. As we have indicated,[10] there was no competent evidence as to the value of the land, so the court could not have properly found that the $105,000 price SBA received for its security interest was inadequate. Moreover, in view of SBA's conclusion, based on an appraisal it had obtained, that the land had a "liquidating value" of $99,839.00, *id.* at 161, the court found that SBA was acting in good faith in releasing its interest in the property.

thereof, or any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto.

(b) To enter into any agreement of forbearance with respect to all or any part of the Liabilities, or with respect to all or any part of the collateral, and to change the terms of any such agreement;

(d) *To* consent to the substitution, exchange, or *release of all or any part of the collateral,* whether or not the collateral, if any, received by Bank upon any such substitution, exchange, or release shall be of the same or of a different character or value than the collateral surrendered by Bank;

(e) *In the event of the nonpayment when due,* whether by acceleration or otherwise, of any of the Liabilities, or in the event of default in the performance of any obligation comprised in the collateral, *to realize on the collateral* or any part thereof, as a whole or in such parcels or subdivided interests as Bank may elect, *at any public or private sale or sales,* for cash or on credit or for future delivery, *without demand, advertisement or notice of the time or place of sale* or any adjournment thereof (*the undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law*), or by foreclosure or otherwise, or to forbear from realizing thereon, all as Bank in its uncontrolled discretion may deem proper, and to purchase all or any part of the collateral for its own account at any such sale or foreclosure, *such powers to be exercised only to the extent permitted by law.*

The obligations of the undersigned hereunder shall not be released, discharged or in any way affected, nor shall the undersigned have any rights or recourse against Bank, by reason of any action Bank may take or omit to take under the foregoing powers.

. . . *The obligations of the undersigned hereunder,* and the rights of Bank in the collateral, *shall not be released, discharged or in any way affected,* nor shall the undersigned have any rights against Bank by reason of the fact that any of the collateral may be in default at the time of acceptance thereof by Bank or later; nor by reason of the fact that a valid lien in any of the collateral may not be conveyed to, or created in favor of, Bank; nor by reason of the fact that any of the collateral may be subject to equities or defenses or claims in favor of others or may be invalid or defective in any way; nor by reason of the fact that any of the Liabilities may be invalid for any reason whatsoever; nor by reason of the fact that the value of any of the collateral, or financial condition of the Debtor or of any obligor under or guarantor of any of the collateral, may not have been correctly estimated or may have changed or may hereafter change; *nor by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral unless such deterioration, waste, or loss be caused by the willful act or willful failure to act of Bank.*

*Id.* at 5, 156–158 (emphasis added).

**9.** See note 8 *supra.*

**10.** See note 5 *supra.*

Having concluded that the executrix was liable under the guaranty for the full amount of the deficiency, $16,877.24, plus interest and costs, the court directed the Government to prepare a final judgment providing for a recovery against the executrix in that sum and for her indemnification against the Simses on her crossclaim. *Id.* at 162. It also directed the Government to consider a compromise settlement with the executrix for two "equitable" reasons. First, the court was concerned by the fact that one of the Simses' wives, Mrs. John Junius Sims, a year after SBA released the 1000 acres of land to her as owner of record for $105,000, had sold the land to Masonite Corporation for $160,000, all to the probable benefit of the principal debtors, the Simses. The court observed that "this profit would be more than ample to extinguish the indebtedness without the necessity of proceeding against the [executrix], who as a result of the tragic death of her husband in a plane crash, has been deprived of her principal means of support." *Id.* at 163. Second, the court considered it to be poor business judgment on the part of the Bank and SBA in not requiring the Simses' wives to execute, along with their husbands, both the need of trust, covering the 1130 acres of land, and the guaranty agreements. The court raised this poor-business-judgment issue sua sponte, the obvious implication being that had the wives been signatories to these documents, SBA would not be looking to Sly's widow for satisfaction.

A compromise settlement was not reached, and, on January 9, 1975, the court entered the final judgment it had directed Government's counsel to prepare. On January 20, 1975, the executrix moved the court to alter and amend the judgment pursuant to Fed.R.Civ.P. 59(e). *Id.* at 165.[11] Among the grounds asserted was the contention that the executrix could not be deemed to have waived notice of SBA's release of its security interest in the 1120 acres of land because the deed of trust, the terms of which were expressly incorporated in the guaranty, required the giving of notice pursuant to section 888 of the 1942 Mississippi Code. On July 2, 1975, the Court, by order, took note of this contention without passing on its merits and requested the parties to present evidence (1) showing the state of the title to the land when deeded in trust and (2) indicating when, if ever, ownership of the land was vested in any of the Simses' wives. The evidence was necessary, the court said, to "give further consideration to the equities of the case." *Id.* at 170, 173.

On September 25, 1975, the district court issued a memorandum opinion altering the final judgment of January 9, 1975. *Id.* at 284. In the opinion, the court adhered to its earlier conclusion that under the guaranty SBA had no obligation to notify the executrix of the disposition of its security interest in the 1120 acres of land, and that, there being no fraud on SBA's part, the executrix stood liable for the $16,877.24 deficiency.[12] The court went on to reiterate that SBA had been guilty of poor business judgment in not requiring the Simses' wives to join in the execution of the deed of trust and guaranties, and it was highly critical of SBA for not seeking execution of its default judgment against the Simses. The court perceived SBA's treatment of the executrix vis-a-vis the Simses as "grossly unfair" and, to do equity, reduced the executrix's liability to one-fourth of the deficiency.[13] Judgment was entered accordingly, *id.* at 298, 300, and this appeal followed.

11. The motion was timely served, and it set forth grounds well within the purview of the rule. The Government's contentions to the contrary are without merit.

12. The court again stated that fraud had neither been charged against SBA nor established by the evidence. Record, vol. 1, at 285.

13. In reaching its conclusions, the court reexamined its prior findings and considered both an affidavit of defense counsel that incorporated copies of official land records obtained by him in the process of a title search and the SBA appraisal that had been offered in evidence by the Government at trial but excluded on hearsay grounds. The Government's objection to counsel's affidavit on grounds of hearsay and relevancy was overruled, and the ruling is assigned as prejudicial error in this appeal. Our disposition of this case makes it unnecessary for us to consider this issue, however. As for the appraisal, it was not utilized by the court to ascertain the fair market value of the property released by SBA, an issue that must be decided on remand.

## II

To determine the rights and obligations of the parties with respect to the collateral released by the SBA without notice to the executrix, we begin with the instruments involved. *United States v. Outriggers, Inc.,* 549 F.2d 337, 339 (5th Cir. 1977). In its analysis, the Government looks only to Sly's guaranty, maintaining that SBA was expressly authorized by its terms to release any of the collateral as it saw fit. The executrix, in her approach to the problem, also relies on the terms of the guaranty, especially the language that she contends makes the guaranty subject to the provisions of the deed of trust, and on general common law principles.

The teaching of our recent opinion in *United States v. Terrey,* 554 F.2d 685 (5th Cir. 1977), well supports her position. In *Terrey,* this Court was called upon to construe an SBA guaranty agreement identical to the one presented here. Drawing on language of the guaranty that renders the powers of the Bank and SBA to deal with the collateral "subject to the provisions of any agreement between the debtor . . and Bank" and exercisable "only to the extent permitted by law",[14] we looked to the security agreements executed contemporaneous with the execution of the guaranty to determine what limitations existed on SBA's authority to proceed against the collateral. We did so with appropriate deference to the notion that federal law controls the rights and duties of the Government when it operates a program such as the SBA loan guaranty program, concluding that the SBA had "contracted for the application of the law of the forum state [Texas]." *Id.* at 692. We said,

> Although the guaranty agreement is stated as unconditional, two important limitations in the document show that the parties intended it to be limited by the Texas UCC. First, the guarantor granted the lender "full power, in its uncontrolled discretion . . . to deal in any manner with the Liabilities and the collateral". But this power was expressly limited by "the provisions of any agreement between the Debtor or any other party and Lender at the time in force". In this case the security agreements, which applied Texas law to the transaction and limited the secured party's remedies to those announced in the UCC, were in force when the Government enforced the guaranty agreement. Consequently, the power of the SBA to dispose of the collateral was limited by the security agreements applying Texas law to the transaction. Second, the rights of the United States upon nonpayment of the debt are expressly limited by the phrase, "such powers to be exercised only to the extent permitted by law". The Government's interpretation of the guaranty as absolute would read this clause out of the contract. We think that the parties intended no such result when they entered the agreement. The more reasonable inference is that they intended to limit the creditor's discretion in disposing of the collateral and to apply the same law that governed the security agreements, which they entered contemporaneously with the guaranty, to the obligation that Terrey [the guarantor] owed the bank and later the SBA.

*Id.* at 692–93.

■ Following the instruction of *Terrey,* because we are confronted with the same guaranty, we look to the deed of trust executed contemporaneous with Sly's guaranty to ascertain the limitations, if any, on the power of SBA to dispose of its security interest in the 1120 acres of land without notice to the executrix. In pertinent part, the deed of trust provides:

> But if default is made in the payment of the note or notes secured hereby . . the trustee herein named . . . shall, at the request of the beneficiary, or at the request of any owner or holder of the

---

14. Compare note 8 *supra.*

note or notes secured hereby, sell said property and land, or a sufficiency thereof to satisfy the indebtedness aforesaid then unpaid. Such sale shall be made by giving notice of the time, place and terms of the sale as required by Section 888 of the Mississippi Code of 1942 and amendments if any thereto, and the trustee shall make a deed to the purchaser or purchasers.

Plaintiff's Exhibit B.

Section 888 of the Mississippi Code of 1942, codified at Miss.Code Ann. § 89–1–55 (1972), provides for the sale of entrusted land in the manner utilized for sales pursuant to judicial decree or in execution.[15] In this case, of course, SBA did not request the trustee to sell the land; rather, it simply relinquished its security interest under the deed of trust for a total consideration of $118,628. Thus, the argument proceeds, SBA did not contravene the foreclosure scheme specified in the trust agreement; it simply devised another one well within the authority granted it by the guaranty.

■ Whether the deed of trust provided the *only* procedure by which SBA could dispose of its security interest in the 1120 acres[16] or whether the parties contemplated that the interest could be released by some other method, we think the *Terrey* rationale requires us to conclude that they meant the

law of Mississippi to apply. Neither the parties' citations nor our search of Mississippi law gives us any guidance, however. Aside from the foreclosure procedure prescribed by Section 888, no Mississippi statute on the books appears to be applicable. Mississippi has adopted the Uniform Commercial Code, but interests in real estate are expressly excluded. Miss.Code Ann. § 75–9–104(j) (Supp.1978). *Accord, Fort Collins Prod. Credit Association v. Carroll Dairy*, 553 P.2d 95, 97 (Colo.Ct.App.1976) (deed of trust on farm, securing promissory note, not governed by UCC). The Mississippi case law is equally unhelpful. To our knowledge its courts have yet to address the issue in a published opinion; consequently, we must anticipate how the Mississippi Supreme Court would approach the problem were it presented.

■ Anticipating that the court would resort to general principles of guaranty law, we turn to the well established notion that where a creditor releases collateral without authorization, the guarantor is discharged to the extent of the value of the collateral released. *See generally* 38 Am.Jur.2d *Guaranty* § 84, at 1091 & n.4 (1968); 38 C.J.S. *Guaranty* § 81, at 1250 & n.58 (1943). For example, in *Goodwin v. Jackson*, 97 Conn. 358, 116 A. 617 (1922), where a mortgage was released without notice to or the

---

**15.** Section 888 provides as follows:

All lands comprising a single tract, and wholly described by the subdivisions of the governmental surveys sold under mortgages and deeds of trust hereafter executed, shall be sold in the manner provided by section one hundred eleven of the constitution for the sale of lands in pursuance of a decree of court, or under execution. All lands sold at public outcry under deeds of trust hereafter excluded, or other contracts hereafter made, shall be sold in the county in which the land is located, or in the county of the residence of the grantor, or one of the grantors in the trust deed, provided that where the land is situated in two or more counties, the parties may contract for a sale of the whole in any of the counties in which any part of the land lies. Sale of said lands shall be advertised for three consecutive weeks preceding such sale, in a newspaper published in the county, or, if none is so published, in some paper having a general circulation therein, and by

posting one notice at the courthouse of the county where the land is situated, for said time, and such notice and advertisement shall disclose the name of the original mortgagor or mortgagors in said deed of trust or other contract. No sale of lands under a deed of trust or mortgage, shall be valid unless such sale shall have been advertised as herein provided for, regardless of any contract to the contrary. An error in the mode of sale such as makes the sale void will not be cured by any statute of limitations, except as to the ten-year statute of adverse possession.

**16.** If a § 888 sale was the exclusive method of disposition available to SBA, the validity of the SBA releases may be in question. *See Fauntleroy v. Mardis*, 123 Miss. 353, 85 So. 96 (1920). That question was not presented to the district court and has not been raised in this appeal. We do nothing more than to mention it in passing.

consent of the guarantor, the court reasoned:

> Plaintiff did not consult with the defendant or procure his assent, but after the mortgage had been released notified the defendant and demanded payment of him of the balance of the guaranteed note. The court found the value of the mortgaged property in excess of the three notes. The effect of the finding is to show that the plaintiff released ample security for less than the amount due. The right of the defendant to be subrogated to the security of value enough to protect him was thus lost. This was in violation of the plaintiff's duty to the defendant, and it was this act of the plaintiff that discharged the guarantor from further liability.

116 A. at 619.

The Mississippi courts could well look to the Uniform Commercial Code, which, though inapplicable to the transaction in question, might appropriately provide a guide to the establishment of precedent on the issue before us. *See, e. g., Tibbitts v. Openshaw,* 18 Utah.2d 442, 425 P.2d 160, 162 n.1 (1967) (although UCC did not apply to an "as is" sale of real estate, the court reasoned from code precedent). Under the Mississippi Code, Miss.Code Ann. § 75–9–504(3) (Supp.1978), it has been held that the failure to give the requisite notice to a debtor does not bar the recovery of a deficiency judgment against him by the secured party; however, the latter must assume the burden of establishing that the sum received for the security represented at least its fair market value. *Walker v. V. M. Box Motor Co.,* 325 So.2d 905, 906 (Miss.1976); *cf. United States v. Whitehouse Plastics,* 501 F.2d 692 (5th Cir. 1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975) (the failure to give notice under the Texas UCC does not bar a deficiency judgment but creates a rebuttable presumption that the value of the collateral sold equals the amount of the debt, thus imposing on the secured party the burden of proving that the fair market value of the goods sold was less than price received). We think it fair to conclude that the Mississippi courts would adopt this approach for interests in real estate.

■ As we have stated above, the district court made no findings as to the fair market value of the 1120 acres of land subject to SBA's security interest; the evidence was insufficient, if not incompetent, to permit such findings. Consequently, the cause must be remanded for that determination. In proceeding on remand, it will be the SBA's burden to establish that the fair market value of the acreage was no greater than the price it was paid for the releases, the presumption being that the collateral was sufficient to satisfy the balance due on the Simses indebtedness.

The judgment of the district court, insofar as it grants judgment in favor of the Government against the executrix and in her favor against the Simses, is vacated and the cause is remanded for further proceedings consistent with this opinion.

VACATED and REMANDED, with directions.