DEPOSITORS TRUST COMPANY, a
Maine Corporation, Plaintiff,

v.

HUDSON GENERAL CORPORATION, a
Delaware Corporation, Defendant.

No. 75 C 1760.

United States District Court,
E. D. New York.

March 13, 1980.

Conboy, Hewitt, O'Brien & Boardman, New York City, for plaintiff; Timothy C. Quinn, Jr., Allin C. Seward, III, New York City, Charles W. Morse, Jr., Boston, Mass., of counsel.

Fried, Frank, Harris, Shriver & Jackson, New York City, for defendant; Edward G. Turan, New York City, of counsel.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Depositors Trust Company of Augusta, Maine ("DTC"), a Maine banking corporation, sues to recover $123,169.90 allegedly due pursuant to a guaranty agreement from Hudson General Corporation ("HGC"), a Delaware corporation with a principal office in Great Neck, New York. Since the undisputed facts involved are rather complex, an understanding of the issues presented requires a detailed narration of certain business transactions which gave rise to the parties' controversy.

### Background Facts

On January 25, 1972, HGC gave DTC a guaranty of payment for $123,169.90, the remaining sum then owing on account of a promissory note of Trans-East Air, Inc. ("Trans-East"), also dated January 25, 1972, which evidenced a loan in the original principal amount of $500,000 made pursuant to a loan agreement between Trans-East and DTC. Subsequent to execution of the guaranty, Trans-East defaulted and DTC sought to recover the final sum of $123,169.90 from HGC pursuant to the guaranty. Relying on a number of transactions occurring after the execution of the guaranty and DTC's failure to give notice, HGC refused to honor the guaranty claiming that its obligation was thereby discharged. This action followed.

DTC had originally extended credit to Trans-East to provide it with capital to continue as operator of the fixed base operation ("FBO") at Bangor International Airport under and pursuant to a franchise and lease agreement dated June 20, 1968, between Trans-East and the City of Bangor. Trans-East agreed to provide ground and routine maintenance service to aircraft landing at Bangor Airport as well as to refuel such aircraft. The Humble Oil and Refining Company, now Exxon Corporation ("Exxon"), supplied the fuel pursuant to supply contracts with Trans-East and stored it in a tank farm at Bangor Airport owned by the City and leased by Trans-East. Trans-East derived the largest part of its revenues as operator of the FBO from its fuel pumping services to airlines, which were contract customers of Exxon. In consideration for performing the fuel pumping services for Exxon, Trans-East was entitled to receive fees ("Exxon fees") from these airlines equal to a maximum of three cents per gallon of fuel pumped. Exxon collected all fees from the airlines and then remitted Trans-East's fees on a monthly basis, one month after collection.

The DTC loan to Trans-East of January 25, 1972, was secured by a security agreement of even date creating security interests in, among other things, (1) all accounts receivable from the FBO operations; (2) a conditional assignment of Trans-East's rights under the City lease; (3) an assignment of Exxon fees; and (4) a conditional assignment of the Exxon fuel agreement. The accompanying note provided, among other things, that principal and interest (at 10% per annum) would be payable by Trans-East in monthly installments of the greater of $5,000 or an amount equal to one-half cent per gallon of the Exxon fees earned by Trans-East for the preceding calendar month.

HGC's guaranty was obtained as a result of Trans-East's request, shortly before closing, that the amount of the loan be increased from the amount originally sought, $370,000, to $500,000. Trans-East informed

DTC that the reason for the increase was to enable it to satisfy a claim made against it by HGC. The parties stipulate that HGC did receive $123,169.90 from Trans-East out of the loan's proceeds, and HGC does not contest that it received valid consideration for the guaranty.

In May 1972, DTC provided Trans-East with additional working capital by advancing $200,000 in cash pursuant to a supplemental loan agreement with Trans-East dated May 23, 1972. That new loan was evidenced by a second promissory note in the principal amount of $200,000 and secured by the same collateral provided by the January 25, 1972 security agreement. The second note provided, among other things, that principal and interest (at 12% per annum) would be payable in five monthly installments of $5,000 or a sum equal to an additional 4/10ths cent per gallon of the Exxon fees earned during the preceding calendar month, with a final payment due on November 23, 1972. HGC did not guarantee the May 1972 loan, nor did DTC give HGC notice of the supplemental loan agreement at the time of its execution or seek HGC's consent in connection therewith.

In late July 1972, DTC learned that the City had declared Trans-East in default under its lease and had given it notice that the lease would be terminated on August 17, 1972, unless the default was cured. Shortly thereafter, on July 28, 1972, DTC gave notice to Trans-East that its default under the lease also constituted a default under the loan agreement.

Trans-East having failed to cure its default to the City, DTC sent written notification of its notice of default under the loan agreement to all guarantors, including HGC. On August 11, 1972, DTC gave oral notice to Trans-East that DTC was taking possession of the FBO at Bangor Airport pursuant to the terms of the loan and security agreements and as creditor-in-possession under Article 9 of the Maine Uniform Commercial Code. Trans-East executed a consent to peaceable entry of possession by DTC and on August 11, 1972, DTC took joint possession of the FBO, with the City acting as DTC's agent.

DTC entered into a management agreement with the City dated August 11, 1972, pursuant to which the City undertook to manage the FBO as DTC's agent and on the condition that the City remit monthly to DTC an amount equal to 9/10ths of one cent per gallon of fuel pumped for Exxon's contract customers at Bangor Airport, i. e., a sum equal to the combined amount of fuel fees Trans-East was obligated to pay DTC as principal and interest on the two loans. The management agreement also provided for direct payment of the Exxon fees to the City.

As of August 11, 1972, the balance of principal and interest remaining unpaid on Trans-East's original note was $475,746.24 and the remaining unpaid balance of principal and interest on the supplemental note was $185,389.13. Application of the fuel fees payable for February-July 1972 reduced principal and payment of interest accrued on the original note, and similar application of fuel fees for June and July 1972 reduced principal and interest on the supplemental note.

On August 29, 1972, an original creditors' petition was filed against Trans-East under Chapter X of the Bankruptcy Act in the United States District Court for the District of Maine, Northern Division.

On October 13, 1972, the Bankruptcy Court issued an order continuing the management agreement in force indefinitely and directing that no change be made in its terms without that court's prior approval. The City remitted to DTC the fuel fees earned for the period August 12 through November 1972, and from these payments DTC applied $36,043.45 to interest and principal due on the original note, reducing principal remaining unpaid on the loan as of December 21, 1972 to $457,147.82. Also from City remittances, DTC applied $28,-834.76 to payment of interest and principal due on the supplemental note. Moreover, on November 24, 1972, proceeds of $73,-296.54 from DTC's collection of Trans-East accounts receivable were applied to interest and principal of the supplemental note. On January 11, 1973, an additional $8,828.88 in

accounts receivable was applied as a principal payment to the supplemental loan, leaving a principal balance of $81,565.17. On February 2, 1973, however, an overdraft of $15,985.27 increased the principal balance to $97,557.44. During the remainder of 1973, $4,786.08 of Trans-East accounts receivable were collected by DTC and applied to the supplemental loan. Thus according to DTC's calculations, the amounts owed by Trans-East under that loan as of February 7, 1974, were principal of $92,771.36 and interest of $12,593.55, or a total of $105,-364.91.

In January 1973, shortly after its latest remittance, the City advised DTC that it was short of funds needed by the FBO for working capital and requested that DTC lend it additional funds. DTC rejected this request, whereupon the City informed DTC that it would postpone remittance of any further payments of fuel fees until the busier summer season. DTC objected to such withholding by the City and decided to terminate the management agreement. Upon advice of counsel that such termination was precluded by the Bankruptcy Court's order, however, DTC reached an informal understanding with the City under which the City continued to operate the FBO under the management agreement, and DTC would receive monthly statements of the FBO fuel fees owed DTC which were to be credited to DTC's account on the City's books. This arrangement continued until July 1, 1975, when the Bankruptcy Court ordered the fuel fees to be paid into a special escrow account.

After several unsuccessful attempts to reach an agreement with the City with respect to the remittance of the fuel fees, DTC retained the accounting firm of Coopers & Lybrand to audit the FBO operation from August 11, 1972 through December 31, 1974. The draft audit disclosed that the City owed DTC $479,144 of accrued fuel fees for the period. After demand by DTC and refusal by the City to make payment, DTC filed a complaint in the bankruptcy proceedings on May 22, 1975, against the City, the Trustee and Exxon seeking a declaratory judgment and recovery against the City of the $479,144.

According to DTC's records, as of May 22, 1975, the City's indebtedness was $550,-225.40 attributable to principal and interest on the original note and $115,475.75 to principal and interest on the supplemental note, or a total of $665,701.15.

On March 12, 1976, the Trustee agreed to accept a joint settlement offer from the City and Exxon of $1,300,000 to resolve all pending litigation and acquire for the City and Exxon jointly the FBO operating rights of Trans-East, subject to the concurrence in the settlement by DTC. Negotiations between DTC and the Trustee led to an agreement that would allow DTC to receive a minimum of $618,000 out of the $1,300,000 of settlement proceeds, if DTC would agree to the settlement proposed by the City and Exxon, with both DTC and the Trustee consenting to binding arbitration by the Bankruptcy Court as to all amounts claimed by DTC in excess of $618,000.

By a memorandum opinion dated March 24, 1976, the Bankruptcy Court rendered its decision upon the arbitration and allowed DTC's claim as to $579,965.87 of unpaid principal and $38,034.13 of interest accrued on all of DTC's claims with respect to Trans-East indebtedness subsequent to the filing of the Chapter X petition, or a total of $618,000. The Bankruptcy Court also held that DTC retained its rights to proceed against guarantors.

By order of March 30, 1976, the Bankruptcy Court set a hearing for April 20, 1976, on applications predicated on the agreement by DTC, the City, the Trustee and Exxon to settle the claims pursuant to a settlement agreement. The proposed agreement dated April 6, 1976 was executed by DTC, the City, the Trustee and Exxon, and on May 6, 1976, was filed with the Bankruptcy Court. The only parties who filed written objections to the settlement agreement were shareholders of Trans-East and the Securities and Exchange Commission. HGC did not appear before the Bankruptcy Court or make objection to it concerning the terms of the settlement agreement.

DTC allocated the $618,000 received from the settlement first to principal and then, in

arithmetic proportion, to interest on three loans of Trans-East, as follows:

| Loan | Principal | Interest | Total |
|---|---|---|---|
| Trainer Aircraft Loan | $ 30,206.91 | $ 1,001.10 | $ 31,208.01 |
| The Loan (original principal amount of $500,000) | 457,147.82 | 29,787.04 | 486,934.86 |
| The Supplemental Loan (original princpal amount of $200,000 plus $13,105.61 advanced to cover an overdrawn payroll account) | 92,611.14 | 7,245.99 | 99,857.13 |
| TOTALS | $579,965.87 | $38,034.13 | $618,000.00 |

It should be noted at this point that all allocations of payments received by DTC for Trans-East loans were never agreed to in writing or orally by HGC, nor did HGC receive notice of such allocations.

After allocation of the $618,000 of proceeds of the settlement agreement in the manner described above, DTC claimed an unpaid and outstanding balance on the original note in the sum of $307,326.01, consisting of unpaid accrued interest from December 22, 1972, to June 4, 1976 ($127,928.86), and legal fees and expenses of collection ($179,397.15). By letter dated September 4, 1975, DTC's counsel gave notice to HGC that its obligation under the guaranty had matured and demanded performance. HGC refused to tender moneys to DTC in connection with the guaranty. As a result DTC commenced this action seeking judgment for $123,169.90 plus interest thereon from September 4, 1975, together with the costs and disbursements of this action.

HGC raises a number of defenses, both common law and contractual, which it ·asserts relieve it of any obligation to DTC under the guaranty. The parties have submitted the controversy to the court for decision on the basis of a stipulation of facts, extensive deposition testimony, exhibits and briefs. This memorandum of decision and order constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

### Discussion

■ At the outset it should be noted that the parties have provided by contract that Maine law is applicable in this diversity action. See guaranty ¶ 8. It is well established that the court will honor the parties' choice of law where there is a reasonable basis for the choice or the chosen State has some relation to the agreement. *Siegelman v. Cunard White Star*, 221 F.2d 189, 195 (2 Cir. 1955); *Weight Watchers of Quebec Ltd. v. Weight Watchers International, Inc.*, 398 F.Supp. 1047, 1051 n.17 (E.D.N.Y.1975). Here Maine law is appropriate under either standard.

■ With respect to a number of the particular issues in question, however, there is a dearth of Maine precedent. In these circumstances,

"even though a state's relevant law is unclear or difficult to ascertain, it is still our duty to render a decision by attempting to apprehend the result that that state's courts would reach, see *Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), and where the relevant law is interstitial, we may look for guidance 'to such sources as the Restatements of Law, treatises and law review commentaries, and the "majority rule" '." *Patch v. Stanley Works*, 448 F.2d 483 (2 Cir. 1971), *citing* C. Wright, Federal Courts § 58 at 208 (1963).

Thus, the court must make its "best estimate" of what the State court—here a Maine court—would rule to be its law, *In re Leasing Consultants Inc.*, 592 F.2d 103, 109 (2 Cir. 1979); *Marina Management Corp. v. Brewer*, 572 F.2d 43, 46 (2 Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 104, 58 L.Ed.2d 123 (1978), and is justified in looking to the law of other jurisdictions, particularly that of New York, for support, see *Ricciuti v. Voltarc Tubes, Inc.*, 277 F.2d 809, 812 (2 Cir. 1960); see also *Schein v. Chasen*, 478 F.2d 817, 821 (2 Cir. 1973), *vacated on other grounds*, 414 U.S. 1062, 94 S.Ct. 568, 38 L.Ed.2d 467 (1974).

Plaintiff initially argues that it holds an unconditional guaranty of *payment* of an obligation which must be considered absolute. For support, it points to language of ¶ 6 of the guaranty wherein it is stated:

"Upon default by the Borrower and upon notice to the Guarantor, the Lender may, at its option, proceed in the first instance against the Guarantor to collect the obligation covered by this Guaranty without first proceeding against the Borrower or any other person, firm or corporation, and without first resorting to any property at any time held by the Lender as collateral security."

Additional support for the interpretation of the guaranty as one of payment is sought in the inclusion of a provision for "prompt payment" in paragraph one of the guaranty. See *First National Bank v. Jones*, 219 N.Y. 312, 114 N.E. 349, 153 N.Y.S. 1114 (1916). Consequently, since a guaranty of payment is absolute and binds the guarantor to pay the debt at maturity in the event the debt has not been satisfied by the principal debtor, and the obligation of the guarantor becomes fixed upon default by the debtor, DTC argues that no precondition to HGC's liability exists other than default by Trans-East and notice to HGC—both of which it claims occurred.

Defendant opposes payment on two related grounds. First, it claims that under the common law of suretyship DTC's conduct since the execution of the guaranty was prejudicial and in violation of the express terms of the guaranty and hence entitles HGC to a complete discharge from any obligation under it. Specifically, HGC contends that it was discharged because DTC entered into the supplemental loan agreement with Trans-East, securing it with the same collateral that secured the original loan; required that the supplemental note be paid off in six months; collected and allocated $115,000 in 1972–1973 to the supplemental note and the overdraft loan; released further claims to the collateral by entering into the settlement agreement, and finally allocated approximately $100,000 of the proceeds of the settlement agreement to the supplemental and overdraft loans and approximately $31,000 to the aircraft loans. These acts are claimed to have resulted in a material alteration of the guaranty contract warranting HGC's discharge. HGC also asserts that these acts, without notice to and consent of the guarantor as provided by contract, provide an additional ground for finding it discharged under the guaranty.

In the view we take of the dispute, resolution requires the answer to two questions: first, whether under the terms of the guaranty HGC has waived its right to assert any defenses; and second, if it has not, whether under common law and the provisions of the guaranty DTC's acts subsequent to the execution of the guaranty without HGC's consent were of such a nature as to discharge HGC's obligation under the guaranty.

Plaintiff's contention that HGC has waived all defenses based on DTC's conduct is founded in its interpretation of ¶ 3 of the guaranty, which states:

"3. *Consent to Lender's Acts.* Guarantor consents, without affecting the Guarantor's liability to the Lender hereunder, that the Lender may, with notice to and consent of the Guarantor (which consent Guarantor will not unreasonably withhold) upon such terms as it may deem advisable;

(a) Extend, in whole or in part, by renewal or otherwise, the time for payment of the indebtedness owing by the Borrower to the Lender or held by the Lender as security for any such obligation;

(b) Release, surrender, exchange, modify, impair, or extend the period of duration, or the time for performance or payment of any collateral securing any obligation of the Borrower to the Lender; and

(c) Settle or compromise any claims of the Lender against the Borrower or against any other person, firm or corporation whose obligation is held by the Lender as collateral security for any obligation of the Borrower to the Lender.

The Guarantor hereby ratifies and affirms any extension, renewal, release, surrender, exchange, modification, impairment, settlement, or compromise; and all such acts shall be binding upon the Guarantor, which hereby waives all defenses, counterclaims, or offsets which

the Guarantor might have by reason thereof."

Although the last sentence of section (c) read in isolation apparently supports plaintiff's position, the provision taken as a whole prohibits specific acts by the Lender absent notice to and consent of the Guarantor. Of critical importance to plaintiff's waiver argument is the fact that the acts specifically requiring notice and consent in ¶ 3 of the guaranty are indeed the acts which assertedly give rise to HGC's defenses. Since neither notice was given nor consent received from HGC (Stip. of Facts ¶ ¶ 16, 45), it would appear, absent the last sentence of the paragraph, that HGC could defend on the ground that DTC breached the guaranty contract by failing to give notice and obtain the consent of HGC when it, for example, extended the supplemental loan and used the collateral securing the original loan to secure the supplemental loan as well.

■ Interpretation of an ambiguous guaranty, under Maine law, is governed by the same rules of construction as other contracts. *Rosenthal v. Means*, 388 A.2d 113, 114 (Me.1978). It is the duty of the court, therefore, to ascertain and give effect to the intention of the parties, *Clark v. Anderson*, 123 Me. 165, 122 A. 337 (1923), which is also the established law of New York, *Catskill National Bank v. Dumary*, 206 N.Y. 550, 100 N.E. 422 (1912); *Utica City National Bank v. Gunn*, 222 N.Y. 204, 118 N.E. 607 (1918). See generally 57 N.Y. Jurisprudence § 74 (1967). In order to determine the intent of the parties, the court may inquire into and consider the circumstances surrounding the making of the contract, *T–M Oil Co., Inc. v. Pasquale*, 388 A.2d 82, 85 (Me.1978); *Monk v. Morton*, 139 Me. 291, 30 A.2d 17, 19 (1943); see *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 248, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975), and may look to the parties' previous dealings and negotiations that led to the execution of the guaranty, *Catskill National Bank v. Dumary, supra*.

■ Evidence submitted in the present case indicates that during the course of negotiations the parties disagreed over in-corporation of a requirement that DTC give notice to and receive consent from HGC prior to taking any action as defined in ¶ 3 of the guaranty. The original draft prepared by DTC expressly stated that HGC's liability was not conditioned on its receipt of notice or express consent to acts by DTC (HGC Exh. B). HGC, however, expressed its disagreement with this provision, and ultimately ¶ 3 was modified to require notice to and consent from HGC (see HGC Exh. D).

The evolution of the provision under question is clear evidence that the parties did not intend to render the first sentence of ¶ 3 superfluous by the last sentence. Thus the court finds that the parties intended that, before DTC could properly act in any manner specified in ¶ 3, it was first obligated to give notice to HGC of such impending action and receive HGC's consent thereto.

■ Even if it were held that this evidence of negotiation did not conclusively establish the meaning of the writing, the guaranty would still be most strictly construed against DTC, the draftsman. Although DTC cites two Maine cases for the proposition that the guaranty must be most strictly construed against the guarantor, *Maine Red Granite Co. v. York*, 89 Me. 54, 35 A. 1014 (1896); *Clark v. Anderson, supra*, these cases simply hold that where the guarantor drafted the document the guaranty must be construed most strictly against him. Consequently, in light of the language in *Clark* unequivocally stating that general rules of contract interpretation apply in the construction of a guaranty contract, these cases are wholly consistent with the general rule that a contract will be most strictly construed against the draftsman. See, e. g., *T–M Oil Co., Inc. v. Pasquale, supra*, 388 A.2d at 86; *Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.*, 436 F.Supp. 262, 270–71 (D.Me.1977); *Hills v. Gardiner Savings Institution*, 309 A.2d 877, 881 (Me. 1973); *Monk v. Morton, supra*, 139 Me. 291, 30 A.2d at 19. Thus, where, as here, DTC drafted the document, any policy permitting strict construction against the guaran-

tor is inapplicable, and no benefit need be extended DTC in these circumstances since it created the ambiguous writing and cannot claim it advanced money in reliance on a construction in its favor.

New York law, moreover, provides further support for this result:

"[The requirement] that an ambiguous guaranty be construed strictly against the guarantor, is premised on the theory that the guarantor has chosen the words of the guaranty, and does not apply where the words of the guaranty are chosen by the creditor and furnished to the guarantor." 57 N.Y. Jurisprudence § 77.

See also *Continental Bank & Trust Co. v. Chemical Bank & Trust Co.*, 51 N.Y.S.2d 903, 907 (Sup.Ct. N.Y. Co.), *aff'd*, 268 App. Div. 858, 51 N.Y.S.2d 82 (1st Dept. 1944); *Manufacturers Trust Co. v. Cavell*, 206 Misc. 818, 135 N.Y.S.2d 566 (Sup.Ct. N.Y. Co. 1954), *aff'd*, 2 A.D.2d 666, 153 N.Y.S.2d 545 (1st Dept. 1956).

■ Nor do we find merit in DTC's further argument that because the guaranty provided that consent by HGC would not be unreasonably withheld, the court must first determine whether it would have been unreasonable under the circumstances to withhold consent had notice been given, and only thereafter consider, if it would have been unreasonable, whether DTC was relieved of its obligation to give notice. This interpretation would render the entire provision meaningless and the court finds no ground exists for such a contention.

Accordingly, HGC has not waived its defenses under the guaranty, and therefore its assertion that common law and contract provisions provide it with grounds for not fulfilling its obligation under the guaranty must be addressed. As noted in the parties' papers and confirmed by the court's own research, there is a dearth of authority concerning modification of a guaranty agreement under Maine common law. Consequently, as discussed above, the common law of other jurisdictions, specifically that of New York, may be considered by the

court in reaching the result a Maine court, applying Maine law, would reach.

Under New York law,

"the defendant's [surety's] obligation is *strictissimi juris*, and he is discharged by any alteration of the contract, to which [the] guaranty applied, whether material or not, and the courts will not inquire whether it is or is not to his injury." *Becker v. Faber*, 280 N.Y. 146, 149, 19 N.E.2d 997, 999 (1939). In interpreting the meaning of *strictissimi juris*, Judge Tenney has stated that "any alteration in the loan made without the consent of the guarantor, whether or not material, operates as a discharge." *Cinerama, Inc. v. Sweet Music, S.A.*, 355 F.Supp. 1113, 1119 (S.D.N.Y.1972), *rev'd in part on other grounds*, 482 F.2d 66 (2 Cir. 1973), *aff'd*, 493 F.2d 1397 (2 Cir. 1974). See also *Bollinger v. Rheem Manufacturing Company*, 381 F.2d 182, 184 (10 Cir. 1967) (New York law applied). Thus, under the rule followed in New York, if DTC modified or changed in any manner its agreement with Trans-East, HGC was discharged regardless of the extent of injury it sustained.

■ It is this court's conclusion that such a modification did occur and hence that HGC is discharged from its obligation under the guaranty. Among other things, DTC's extension of the supplemental loan to Trans-East, secured by the same collateral that secured the original loan, and later application of the proceeds of the collateral to satisfy the supplemental loan, among others, all without notice to and consent of HGC, resulted in such a modification and discharge.

It is true, as plaintiff points out, that paragraph IB of the security agreement between Trans-East and DTC dated January 25, 1972 states that:

"The security interest hereby granted is to secure payment of the principal and interest on the promissory note executed and delivered by the Debtor to the Secured Party of even date and any extension or renewal thereof and of *any additional indebtedness of the Debtor to the Secured Party subsequently incurred, and*

to secure the performance of all obligations of the Debtor to the Secured Party hereunder." (Emphasis added.)

While the security agreement most assuredly defines certain rights with respect to the collateral between the parties to the agreement, the provision quoted above, standing alone, cannot be deemed to fix the rights and obligations of non-parties to that agreement, assuming such non-parties had notice of and hence were bound by its provisions; the borrower's agreement to permit a security interest in the collateral to secure additional indebtedness must be read consistently with the guarantor's right, if any, to rely on the existence of the stated collateral to either satisfy the underlying obligation or look to if it became subrogated to the lender's rights upon payment on the guaranty.

■ Here, examination of the relationship between the parties and Trans-East discloses that HGC had such a right. First, the parties intended, as discussed above, that HGC have notice of and give consent to certain acts, here claimed to have impaired its interest in the collateral. There is no evidence that HGC granted DTC full power or complete control over the collateral. *Cf. United States v. Willis*, 593 F.2d 247 (6 Cir. 1979); *United States v. Sims*, 586 F.2d 580 (5 Cir. 1978). On the contrary, the record reveals that HGC bargained successfully for the right to maintain some control over the collateral, which is consistent with an intention to have the collateral available in the event of a default by Trans-East. Second, the loan agreement itself explicitly set out the collateral securing the loan, and various other documents, *e. g.*, the Assignment of Funds Due Under the Agency Agreement (Stip. Exh. 8), provided for disposition of portions of the security. Finally, the security agreement and provision permitting use of other portions of the collateral to secure additional indebtedness, with notice to and consent of HGC, provided for the remainder of the collateral. In these circumstances, it is apparent that DTC had a duty to adhere to the strict letter of its agreements and HGC had a resulting right to rely on such adherence. See *Frederick v. United States*, 386 F.2d 481, 486 (5 Cir. 1967). See also *United*

*States v. Continental Casualty Co.*, 512 F.2d 475, 478 (5 Cir. 1975). Since application of the proceeds of the collateral was apparently insufficient to repay both loans, the loss must fall on DTC rather than on the guarantor, since its reliance on the collateral to repay both loans was unjustified and HGC's undertaking was modified and risk increased by DTC's actions without notice to it nor its consent.

■ Assuming, moreover, that the terms of the security agreement alone bind HGC in these circumstances, it should be noted that its obligation is nonetheless discharged. Application of proceeds from the "Assignment by Borrower to Lender of all sums due and to become due from Humble Oil & Refining Company," designated as collateral in § 1.03(c) of the loan (Stip. Exh. 3), to satisfaction of other loans resulted in such a discharge. While paragraph IB of the security agreement could be read to permit the other collateral to secure additional indebtedness in certain circumstances, careful examination of the security agreement reveals that the Exxon fees were not included. Instead, disposition of these fees was provided for in a separate document entitled "Assignment of Funds Due Under Agency Agreement" (Stip. Exh. 8), by Trans-East to DTC, dated January 25, 1972. This assignment contained no provision comparable to paragraph IB and in fact directed DTC to "withhold and apply to its own use an amount equal to the monthly payment due Depositors Trust Company on account of the promissory note given by the Borrower [Trans-East] to the Lender [DTC] of even date," and *inter alia* to deposit the balance to Trans-East's account. Thus, application of any portion of the Exxon fees due pursuant to the agency agreement to satisfaction of the supplemental loan, for example, modified the guaranty agreement and discharged HGC's obligation as guarantor.

Although DTC claims that the assignment not only gave it the right to apply one-half cent per gallon of the Exxon fees to satisfaction of the note but also permitted it to apply amounts in excess of these

sums to other outstanding balances as "accounts receivable" within the meaning of paragraph IIC of the security agreement, it is the court's conclusion that express provision for all the Exxon fees by assignment excluded those fees from any provision permitting their use to secure additional indebtedness. Since it is apparent that the parties looked to the Exxon fees as the source of continuing payment of Trans-East's obligation under the loan, it is reasonable that the parties intended that these fees be specifically earmarked for application to that loan and no other, assuming the other collateral could properly be applied to secure subsequent indebtedness.

The result reached here is also consistent with that obtained upon application of the rule suggested in the Restatement of Security § 128(b)(i). It states in relevant part:

"Where, without the Surety's consent, the principal and the creditor modify their contract otherwise than by extension of time of payment . . .

(b) the compensated surety is

(i) discharged if the modification materially increases his risk . . . ."

Under the facts presented, the subsequent use of the collateral to secure the supplemental loan, for example, was a modification that undoubtedly increased materially HGC's risk. In *St. Petersburg Bank & Trust Company v. Boutin*, 445 F.2d 1028 (5 Cir. 1971), the court on substantially similar facts also found a materially increased risk. It stated:

"This [the Restatement rule] is simply a more specific application of the general principle that, since a suretyship obligation is imposed only with the express consent of the promisor, he is entitled to stand upon the strict terms of his undertaking, and a new contract may not be substituted for the old one without his consent. Stearns, *The Law of Suretyship*, § 6.2 (Elder ed.)." 445 F.2d at 1031.

Here, as in *St. Petersburg*, the guarantor justifiably relied on the existence of the specific collateral. Thus, since the modification materially increased HGC's risk, its obligation is discharged even under the more liberal Restatement rule. See also *Pergament v. Herrick Credit Corp.*, 200 N.Y.S.2d 535 (Sup.Ct. Kings Co. 1960).

Finally, the parties have stipulated that DTC neither gave notice to nor received consent from HGC before engaging in the acts referred to above. Since the court has concluded that HGC did not waive its defenses—including contractual defenses—to this action, DTC's failure to give notice and receive consent provides an additional basis under the explicit terms of the agreement for holding HGC discharged from its obligation under the guaranty.

We have considered DTC's various arguments and find none has merit. Its contention that it reserved its right against HGC in the bankruptcy proceeding, and cases claimed to support such a proposition, do not require a contrary result under the circumstances presented. Cf. *Walter E. Heller & Co. v. Cox*, 343 F.Supp. 519 (S.D.N.Y.), aff'd, 486 F.2d 1398 (2 Cir. 1972), cert. denied, 414 U.S. 827, 94 S.Ct. 46, 38 L.Ed.2d 61 (1973); *Warner Lambert Pharmaceutical Co. v. Sylk*, 348 F.Supp. 1039 (E.D.Pa.1971), aff'd, 475 F.2d 1398 (3 Cir. 1973); *Standard Brands Inc. v. Straile*, 23 A.D.2d 363, 260 N.Y.S.2d 913 (1st Dept. 1965). Similarly, plaintiff's reliance on *In re Applied Logic Corp.*, 576 F.2d 952 (2 Cir. 1978), for the general proposition that a creditor absent directions from the debtor may apply payments as he sees fit, is unfounded. Of critical significance is the fact that *In re Applied Logic Corp.* did not involve a contract of guaranty. Moreover, the case and the others cited by plaintiff involve for the most part application of ordinary payments on the debt rather than, as here, application of the proceeds of collateral without consent of the guarantor as required by the guaranty agreement.

Finally, DTC's claim for attorney's fees is without precedent. Such authority as exists provides for payment of fees either where explicitly provided for by some writing or where the party prevailed in the action on the guaranty. In the circumstances of this action, it is clear no award of attorney's fees is warranted.

Accordingly, judgment is granted defendant HGC dismissing the complaint.

SO ORDERED.